Lawrence J. King, Esq., #120805
**LAW OFFICES OF LAWRENCE J. KING**
**11 Western Avenue**
**Petaluma, CA 94952**
**Telephone:  707-769-9791**
**Fax:  707-769-9253**
**Email:  kingesq@pacbell.net**

**Attorneys for Plaintiff Ana Isabel Moreno**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA
### FRESNO DIVISION

| | |
|---|---|
| **ANA ISABEL MORENO,** | **CASE NO. 1:23-cv-00541 JLT SKO** |
| **Plaintiff,** | |
| | **PLAINTIFF'S THIRD AMENDED COMPLAINT FOR:** |
| **v.** | **(1) SEX DISCRIMINATION IN VIOLATION OF TITLE VII,** |
| | **(2) RETALIATION IN VIOLATION OF TITLE VII,** |
| **CITY OF PORTERVILLE** | **(3) DEPRIVATION OF CIVIL RIGHTS IN VIOLATIONS OF 42 U.S.C SECTION 1983;** |
| **Defendant.** | **(4) SEX DISCRIMINATION IN VIOLATION OF THE FEHA; AND** |
| | **(5) RETALIATION IN VIOLATION OF THE FEHA** |
| | **AND** |
| | **PLAINTIFF'S DEMAND FOR A JURY TRIAL.** |
| | **UNLIMITED CIVIL ACTION.** |

NOW COMES PLAINTIFF **ANA ISABEL MORENO,** and files this her complaint,

demanding a jury trial and alleging the following:

\\

\\

\\

\\

1

# INTRODUCTION

1.    Plaintiff brings this suit to vindicate her right, and the right of all California employees, to work in an environment free from sex discrimination, harassment, and retaliation.

2.    The Porterville Police Department ("PPD") and the City of Porterville have a significant problem that they bitterly refuse to acknowledge and correct. The highest rungs of PPD leadership are composed of a "boys' club" of male officers, including current Chief Jake Castellow, who have for years violated the rights of the female police officers, violated the rights of male officers who spoke up for those female officers, and even violated the rights of female citizens. When these female officers or their male allies have spoken up, formally or informally, men like Chief Castellow and Assistant Chief Dominic Barteau and numerous others have rallied around the violators and orchestrated the firing of the complainants and the ruining of their careers.

3.    Now that time has gone on and male officers formerly in "the club" have left or been fired, those male officers are reaching out to the female officers they witnessed being harassed and unlawfully terminated, and they are sharing the Department's secrets. For example, a favorite strategy employed by PPD leadership to swiftly dispatch a whistleblower is by catching them in a lie; not necessarily a real lie, but a manufactured one is sufficient. A whistleblower dates and submits a routine report, but a superior officer accuses them of submitting the report a day or two after the day they dated it. According to the Department leadership, they have falsified official reports and are immediately disciplined or terminated - because lying for a police officer is always grounds for termination.

4.    In 2018, a former PPD sergeant and head of the Porterville Police Officers Association was caught red-handed by Tulare County deputies with a 17-year-old Porterville Police Department Explorer. He was immediately arrested for molesting a minor. Then-Chief Eric Kroutil claimed in a press release that he was "shocked, saddened and angry that [the sergeant] had tarnished the image of the Porterville Police Department." The sergeant's

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

"punishment" according to news reports was **paid leave** pending the outcome of the criminal investigation.

5.     In 2020, four female officers filed grievances with the City of Porterville alleging sexual harassment, discrimination, and retaliation. Those women have claimed that there are many more female officers currently employed by PPD who are suffering but too scared to come forward because they have witnessed what happens to the women who do.

6.     The City of Porterville is currently defending an unknown number of civil actions alleging these same causes of action. Yet in 2022, the City Council unanimously upheld the termination by PPD of a female officer who had made a formal complaint that she was being sexually harassed by a PPD sergeant. The official reason given by PPD for her firing according to news reports was her alleged lying about her "use of a personal vehicle when traveling to Sacramento to go through basic traffic collision training."

7.     The Porterville Police Department's problem is its widespread practice of supporting, retaining, and promoting male officers who sexualize, demean, harass, taunt, and bully female officers with no repercussions or discipline, while unlawfully terminating or forcing out anyone who complains.

8.     Like the female officers above, Plaintiff was subjected to repeated unwelcome sexual advances from three of her direct supervisors while employed at the Porterville Police Department ("PPD"). For refusing her supervisors' sexual advances, Plaintiff was subjected to open hostility, unwarranted criticism, bullying and humiliation, intentionally dangerous work assignments, and direct threats of discipline and termination intended to cause her fear and anxiety. One of the offending supervisors, Bruce Sokoloff ("Sokoloff"), whom Plaintiff initially considered a mentor, began an unwelcome and persistent pursuit of Plaintiff throughout the month of December 2020, including harassing her via text over the course of five days to have drinks alone with him, and then harassing her repeatedly over the course of four days to go away with him alone while his wife and children were out of town. Plaintiff opposed his sexual harassment. After Plaintiff failed to submit to his advances, Sokoloff became punitive and

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

embarked on a retaliatory course of conduct that was intended to, and did, cause Plaintiff ongoing fear, anxiety, humiliation, and alienation at work that forced her to resign before her career was ruined by being fired.

## PARTIES AND VENUE

9.    Plaintiff was, at all times relevant herein, a resident of Tulare County, California and a Porterville Police Department employee.

10.    The City of Porterville is Charter City, located in Tulare County California, which is within the jurisdiction of this Court.

11.    Porterville Police Department is a Department of the City of Porterville.

12.    Plaintiff alleges on information and belief that Sokoloff was, at all times relevant herein, employed by the Porterville Police Department and a resident of Tulare County.

13.    Plaintiff is informed and believes and upon such information and belief alleges that each of the defendants herein was, at all times relevant to the action, an agent, employee, and/or co-conspirator of the remaining defendants and was acting within the course and scope of that relationship.  Plaintiff is further informed and believes and upon such information and belief alleges that each of the defendants herein gave consent to, ratified, and authorized the acts alleged herein of each of the remaining defendants.

## JURISDICTION & VENUE

14.    Jurisdiction is proper in this Court under 28 U.S.C. 1331 because three of Plaintiff's causes of action are based on federal statutes.

15.    Venue is proper in this Court because some or all of the acts upon which Plaintiff bases her causes of action took place within the geographic jurisdiction of the United States District Court for the Eastern District of California, Fresno Division.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16.    On July 12, 2022, Plaintiff filed a complaint with the United States Equal Opportunity Commission ("EEOC") and requested that her complaint be cross-filed with the California Department of Fair Employment & Housing ("DFEH"). The EEOC issued Plaintiff a

"right-to-sue" notice on January 12, 2023.  The DFEH issued Plaintiff a "right-to-sue" notice on April 4, 2023.

### FACTUAL ALLEGATIONS

17.    Plaintiff was born and raised in the City of Porterville. At the age of fifteen, she began volunteering at the PPD as a Police Explorer.

18.    In May 2011, after volunteering extensively with PPD for three years, Plaintiff was hired by the PPD as a Community Service Officer at the age of eighteen.

19.    In January 2013, the City of Porterville sponsored Plaintiff's enrollment in the State Center Regional Training Basic Police Academy. She graduated from police academy in June 2013, and three days later joined PPD as a Peace Officer.

20.    Upon becoming pregnant with her first child, Plaintiff was removed from patrol and reassigned to the Communications Center to work as a dispatcher. She remained assigned as a dispatcher through the birth of her second child. When Plaintiff sought to return to her patrol position as a Peace Officer once her second child was no longer an infant, she was informed that position was not available to her. Because her Peace Officer Standards and Training ("POST") certificate would soon be expiring, she applied out to other agencies.

21.    In February 2017, Plaintiff left the PPD to work with the County of Tulare District Attorney's Office Bureau of Investigations as a Welfare Fraud Investigator. After working this position for approximately 10 months, she was promoted to the position of Criminal Investigator with the Bureau of Investigations. Despite being happy in her position, Plaintiff longed to return to police work and the PPD.

22.    On September 3, 2019, after two and a half years working as an Investigator for Tulare County, Plaintiff returned to PPD as a Peace Officer.

23.    Sgt. E. Martinez was assigned as her direct supervisor. Soon afterwards and on several occasions, Sgt. Martinez became angry and yelled at Plaintiff in front of her fellow officers. The yelling was unwarranted and unprofessional, and humiliated Plaintiff. She noticed her fellow male officers did not receive public "dressing-downs" from Sgt. Martinez. Sgt.

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

Martinez would later come to Plaintiff *privately* and say he had "over-reacted." However, his pattern of yelling at and insulting Plaintiff in front of her co-workers continued. Sgt. Martinez did not criticize her male co-workers in front of other employees.

24.    On December 15, 2019, while attending a social gathering at a fellow PPD officer's house with her children, Plaintiff was met outside by Sgt. Martinez. Sgt. Martinez appeared to be intoxicated. He addressed Plaintiff and said that if he told her: "So if I say do this, it means you just do it. And if I say 'Let's fuck,' it means let's fuck."

25.    Plaintiff was embarrassed and shocked and did not respond. A fellow officer who had overheard the exchange quickly ushered her into the house and away from Sgt. Martinez.

26.    In the days and weeks following this incident, Plaintiff never addressed it with Sgt. Martinez, as he was her direct supervisor and she feared he would become angry or retaliate if she mentioned it. However, she learned that Sgt. Martinez had been telling fellow male officers to be "careful" around Plaintiff because she was "the type who would file a complaint," causing Plaintiff to be alienated from her fellow officers.

27.    On March 1, 2020, Sokoloff became Plaintiff's supervising Sergeant. Between March and December 2020, Plaintiff worked closely with Sokoloff, who introduced her to his wife and two daughters. Plaintiff grew to consider him a mentor.

28.    However, Sokoloff soon began making demeaning sexual comments and inappropriate advances to Plaintiff. For example, on April 19, 2020, after Plaintiff arrested a man at Veteran's Park for public masturbation, Sokoloff messaged Plaintiff, "He may think of u next time he plays with himself." On May 17, 2020, Sokoloff texted Plaintiff a picture of a beer and wrote, "When u don't have your kids after work I'll share one with u."

29.    Despite feeling the creep of unwelcome and inappropriate comments into their working relationship, Plaintiff believed that Sokoloff was the senior officer most willing to mentor her, and she thought that he genuinely cared about her career as a police officer.

30.    During this same time period, Corporal Enrique Lara was her other supervisor. Cpl. Lara initially was openly hostile to Plaintiff. He would ignore her when she asked him a

6
PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

1    question, acting as though she was not speaking to him, and then walk away. Plaintiff never saw

2    Cpl. Lara ignore male officers when they spoke to him. As with Sgt. Martinez, Plaintiff did not

3    initially understand why Cpl. Lara treated her this way, in a manner that he did not treat similarly

4    situated male officers.

5          31.    Shortly thereafter, throughout the month of December 2020, Sokoloff engaged in

6    a persistent and unwelcome romantic pursuit of Plaintiff. On December 7, 2020, he texted

7    Plaintiff repeatedly to ask her to have a drink outside of work that weekend. On December 9,

8    2020, he again texted Plaintiff repeatedly saying that if she was not working, she should get

9    together with him for a drink. On December 11, 2020, he again repeatedly texted Plaintiff saying

10   that he was going to be alone that weekend because his wife and children would be in Los

11   Angeles. Plaintiff replied that if he was going to be alone, she would not have a drink with him

12   because she felt it would be inappropriate and suggested to Sokoloff that it would upset his wife.

13   Sokoloff responded that if Plaintiff came to his house for drinks, he was not going to tell his

14   wife. This made Plaintiff extremely uncomfortable, as he was openly suggesting a secret

15   meeting. He then followed up immediately with a text telling Plaintiff that if she wanted to be a

16   Field Training Officer ("FTO"), he "knew the sergeant really really well," suggesting he could

17   do her favors or help her career. Plaintiff ended up arranging with her friend to accompany her to

18   Sokoloff's house for dinner and drinks on December 12, 2020, because she felt uncomfortable

19   and did not want to be alone with him.

20         32.    On or around December 28, 2020, began a three-day siege of numerous, harassing

21   text messages to Plaintiff attempting to get her to go away alone with him out of town. Sokoloff

22   began by texting Plaintiff saying he would be free New Year's weekend and they should spend it

23   together. He said his family would be out of town and suggested they go to Ventura and stay in a

24   hotel. These requests made Plaintiff extremely uncomfortable. Sokoloff was her supervisor, and

25   she had personally witnessed and participated in internal PPD investigations involving previous

26   female officers who were harassed and then retaliated against within the PPD. She declined his

27   invitation.

28

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

33.     But Sokoloff persisted and continued to text Plaintiff. He wrote, "So since u said no to Ventura… how bout Vegas for NYE?" She again refused. He wrote back, "It's only 5 hrs… I'll have u back by briefing." Plaintiff again declined, and Sokoloff responded, "Freakin call in with Corona symptoms. That'll get u an extra day, " and "[R]emember, your shift has the staffing so don't feel bad if u call in sick," – in other words, Sokoloff was advising Plaintiff <u>to lie to PPD</u> and falsely claim COVID symptoms just so he could get her to go to Las Vegas alone with him. Lying to the Department, for any police officer, is a serious offense that results in termination and a mark on one's personnel file that will end a law enforcement career.

34.     Sokoloff continued to pester Plaintiff with repeated texts over the next three days insisting that she spend New Year's Eve with him. He told her to trade shifts with another officer to get the time free. He suggested she tell PPD that her children were sick and she needed to care for them (another lie). Plaintiff told Sokoloff she would not do these things. He said he would put on his uniform and come into work despite being on vacation, "if that's the only way we can have dinner." At 4:26 p.m. on December 31, Plaintiff texted Sokoloff telling him that her mother's family had just showed up and she would not be able to come over. He replied, "Tell your mom u have a hot date and you'll see her later." When Plaintiff replied that she would not do that, Sokoloff wrote, "You're one tough girl to meet up with. There's steam coming off the spa already. If anything changes and u can get outta there… I'll be home."

35.     As a result of these persistent advances, Plaintiff from that point on experienced fear and apprehension when going to work and interacting with Sokoloff. Because he was her supervisor, and because Plaintiff had been experiencing hostility and then unwanted sexual advances from her other supervisor, Cpl. Lara, described more fully below, Plaintiff was denied the normal professional mentoring relationship that male PPD junior officers enjoyed with their supervisors. This necessarily interfered with her job performance as well as her ability to obtain the guidance and support necessary to advance.

36.     Shortly after Plaintiff rebuffed Sokoloff, beginning in mid to late January, his behavior towards her turned 180 degrees. His demeanor towards Plaintiff became impatient,

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

terse and unfriendly. He excluded her from social gatherings he hosted for fellow officers and began targeting Plaintiff with unwarranted criticism.

37.     One specific example occurred on February 11, 2021, Sokoloff belittled Plaintiff in front of her colleagues and falsely accused her of gross incompetence, telling her she "can't do shit right."

38.     Similarly, March 10, 2021. Plaintiff completed and submitted a 5150 mental health hold report consistent with numerous others she had submitted previously without any issue. She later received a terse message from Sokoloff, stating her report was "not acceptable" and "I hope u correct this deficiency quickly before u start as an FTO." Plaintiff's report was no different than any other she had written, but now she suddenly was being closely scrutinized, held to a different standard than her male co-workers, and criticized and threatened with consequences to her career.

39.     The next day, March 11, 2021, Plaintiff was working night shift, and Sokoloff began hazing her about not making as many arrests as he thought she should. He taunted and belittled her, asking if he needed to go out and find her an arrest for her since she wasn't able to make an arrest herself. Then he warned her that he was going to find a "nasty transient" for her to arrest and deny her a transport request. Sokoloff knew that Plaintiff had a K-9 in the back of her vehicle that shift. Standard operating procedure ("SOP") at PPD is that K-9 units may not transfer arrestees because those units only have the front passenger seat available for transport, and that is considered inherently unsafe to place to arrestees in the front seat while the officer drives. PPD SOP requires a caged transport unit to be dispatched to the scene when a K-9 unit makes an arrest. The only time K-9 units may transfer an arrestee is under exigent circumstances (i.e., no other unit is available), and then only if the arrestee in coherent and cooperative. Therefore, Sokoloff was threatening to intentionally violate PPD safety protocol and place Plaintiff at unreasonable risk of work-related injury.

40.     About an hour before the end of her shift, Sokoloff radioed Plaintiff and ordered her to come to his location. When Plaintiff arrived, Sokoloff was with an intoxicated male

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

transient. The transient and the areas he frequented were well-known to PPD officers. This particular detainee was known to wear clothing that had been repeatedly self-soiled. On this occasion, his pants sagged and exposed his genitalia and buttocks. It was clear to Plaintiff that Sokoloff had searched and found this man to make good on his earlier threat. Sokoloff then left Plaintiff alone at the scene, ordering her to perform a field sobriety screen and transport him to jail. The rear seat of Sokoloff's vehicle was free at the time, and he would have been able to transport the individual safely, unlike Plaintiff. Sokoloff's order put Plaintiff in an inherently dangerous position.

41.    Plaintiff struggled alone to clear her front passenger area of gear while holding onto the man, who was so intoxicated that Plaintiff feared he would fall down and hurt himself or that she would not be able to get him back up. While enroute, he became agitated and rambled incoherently while making jerking body movements. Plaintiff feared that he would attempt to hurt either himself or her.

42.    This incident was egregious and unconscionable in light of PPD policy that requires supervisors to protect the safety of all officers, particularly their subordinates. Sokoloff knowingly and unreasonably placed Plaintiff at high risk of a workplace injury. Moreover, this risk was completely unnecessary given that Sokoloff could easily have 1) transported the inebriated transient safely in the back seat of his unit, or 2) allowed Plaintiff to call for a transport in another vehicle. Plaintiff now recognized that Sokoloff was willing to jeopardize her safety just to harass and punish her in retaliation for her refusing his sexual overtures.

43.    After leaving Plaintiff alone with the transient, Sokoloff went back to the Department and told Plaintiff's fellow officers what he had done to Plaintiff, thereby broadcasting to Plaintiff's peers that he had targeted her for maltreatment and she was therefore an appropriate target of ridicule, maltreatment, and humiliation.

44.    In addition to Sgt. Martinez' and Sokoloff's sex-based harassment, Cpl. Lara went from giving Plaintiff "the silent treatment" to sending her unsolicited pictures and messages asking her to spend time alone with him beginning in or around December 2020/January 2021.

1   Plaintiff declined his requests, or sometimes did not respond to avoid having to decline.

2       45.    On or around February 23, 2021, Cpl. Lara confronted Plaintiff at work about not

3   replying to a video he sent her the previous day or to a personal, inappropriate message he had

4   sent the day before that. He wanted Plaintiff to explain why she had not responded to his

5   personal overtures, which made Plaintiff extremely uncomfortable.

6       46.    On or around March 1, 2021, Plaintiff documented that Cpl. Lara was ignoring

7   her because she had not responded to several personal, inappropriate messages from him the

8   weekend prior. His hostile pattern of refusing to respond to her work-related inquiries interfered

9   with her ability to learn and do her job.

10      47.    Later, on or around May 14, 2021, Cpl. Lara sent Plaintiff a disturbing and

11  repulsive video of himself naked from the waist up, drinking a beer, and asking her to come to

12  his residence to swim alone with him. Plaintiff declined.

13      48.    In early 2021, Plaintiff began a romantic relationship with Anthony Luckey, who

14  had recently joined the PPD as a Peace Officer after working for a number of years at the Tulare

15  County Sheriff's Department. Plaintiff and Mr. Luckey are now married with a family consisting

16  of children from their previous marriages as well as a child of their own. News of their

17  relationship spread informally within the PPD.

18      49.    Between  March and September 2021, after it became known that Plaintiff and

19  Luckey were romantically involved, Sokoloff created an increasingly hostile work environment

20  for Plaintiff. As a result, Plaintiff had anxiety about going to work and being around him. It

21  became apparent to her co-workers that Sokoloff was unhappy with her. Plaintiff was constantly

22  asked by fellow officers what had occurred that upset him or if she knew why he was acting the

23  way he was towards her.

24      50.    On July 21, 2021, Plaintiff was working on a traffic collision report and needed to

25  take photographs. Her camera's battery had died and so she asked to use her partner's camera, as

26  was often done. Sokoloff was on scene when the camera was dropped off. He later called

27  Plaintiff and questioned why she was still on scene and telling her she should have completed her

28

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

report by then. In her defense, she sent him a photograph of the call screen indicating that the tow was called late by dispatch and it was therefore not her fault. He then texted her tersely, "Pay attention and don't cut off the conversation between Fernando and dispatch," and then wrote, "I'm doing a property audit. Need your camera to make sure the serial numbers match." Plaintiff went into the police department with her camera. Sokoloff told her when she arrived that he believed she was going to bring in someone else's camera and try to pass it off as hers. In other words, he expected that Plaintiff would lie by bringing in another camera as her own, and that he would "catch her" in that lie and discipline her.

51.    Around this time in July, Sokoloff told Plaintiff that she had "changed." He then accused her of missing work a lot, falsely suggesting that Plaintiff's absences were too frequent and unjustified. Plaintiff responded that all of her absences were due to being sick, caring for sick children, or being on training or approved vacation. Plaintiff also said that several other officers were missing many more days and at a higher frequency, but they were not getting in trouble, so she did not understand why he was criticizing her.

52.    On August 1, 2021, Sokoloff messaged Plaintiff to tell her that he was being promoted from Sergeant to Lieutenant, but that it had not yet been officially announced. He wrote, "Just make sure u don't get wrapped up in an [Internal Affairs investigation] I have to do." His promotion was announced later that month.

53.    On August 18, 2021, Plaintiff was sent home ill and ordered to take a COVID test. Before she left, Sgt. Lara asked her if Officer Luckey was at her house (the Department knew that she and Officer Luckey were living together during the week), and she replied that he was. Later that day, Plaintiff and Officer Luckey went together to get tested for COVID because Plaintiff has gotten significantly sicker and could not drive the 45 minutes to the clinic alone. Plaintiff tested positive and Officer Luckey tested negative. Sokoloff called Plaintiff while she and Officer Luckey were driving home from the clinic. After hearing the test results, he grew very angry with Plaintiff for being driven to the clinic instead of going alone. He then told Plaintiff that Officer Luckey was not allowed to be at her house and or to have any contact with

her. He told Plaintiff to put him on speaker so that Officer Luckey could hear, and angrily expressed his unwarranted disapproval of both of them and their actions, despite neither of them having done anything wrong – they had not violated any PPD, City, or State COVID or quarantine protocol. Sokoloff added that if anyone saw them in Porterville together, they would be in trouble and even possibly fired.

54.    To Plaintiff's knowledge, no other employee at PPD who contracted COVID was ever ordered to stop cohabitating or cease physical contact with their significant other.

55.    After Plaintiff completed quarantine and returned to work, she was assigned light duty due to still being weak and experiencing breathing difficulties. During Plaintiff's time on light duty, Sokoloff kept a constant watch on Plaintiff. His hovering and excessive check-ins made Plaintiff uncomfortable, as though she were being surveilled for any mistake or cause for discipline. He monitored her comings and goings during her shifts by smoking at the Department's south entrance/exit, whereas he had only smoked at the east entrance/exit up until that time and continued to smoke there again when Plaintiff returned to patrol duty. She was essentially being stalked while at work, which caused her constant stress and anxiety.

56.    On September 27, 2021, Plaintiff was taken off light duty and returned to patrol. The next day, September 28, Plaintiff located an unoccupied vehicle with a license plate belonging to a different vehicle. She called Sgt. Lara[1] to brief him, and he told her to wait to see if someone would leave in the vehicle. The vehicle drove away and Plaintiff conducted a stop. She turned her body camera on as she briefed a CHP officer who had pulled in behind her. When Sgt. Lara arrived on-scene, she hit the camera mute button and realized it had not been recording. She showed Sgt. Lara and told him she did not know why it was not recording, then continued her investigation. Sgt. Lara expressed no concern about the camera. Plaintiff removed the license plate from the vehicle and placed it in the PPD secure Evidence Locker at the end of her shift. This was something that all patrol officers do or have done. As long as the evidence is secure in a locker, it can later be entered into the Evidence System. Plaintiff had never been counseled

---

[1] Corporal Lara had been promoted to Sergeant by this time.

1   against doing this or had witnessed any officer getting reprimanded or disciplined for doing this.

2   Moreover, Sgt. Lara explicitly told Plaintiff that there was no problem with securing the license

3   in the Evidence Locker.

4           57.     On September 30, 2021, Officer Luckey was terminated as the result of an

5   Internal Affairs investigation initiated and conducted by Sokoloff.

6           58.     The next day, September 31, 2021, Plaintiff was directed to report to Sokoloff,

7   who had come in on his day off just to meet with her. He was alone in his office and informed

8   her that he was the one who had initiated and conducted the Internal Affairs investigation that

9   resulted in Officer Luckey's termination. Sokoloff told Plaintiff that Department administrators

10  were now keeping an eye on her; that she would be under scrutiny for possible negative

11  responses to Officer Luckey's termination.

12          59.     Sokoloff then shifted the subject and began telling Plaintiff that he had significant

13  influence in the Department because of his close friendship with Captain Barteau. He said that

14  although "the Administration was worried" about her reaction to Officer Luckey's termination,

15  he believed she could still promote and potentially have a successful career there. Plaintiff

16  understood that he was telling her that if she wanted to continue her career at the PPD, she

17  needed to make Sokoloff happy and act like she was not upset with or mistrustful of him.

18  Plaintiff left that meeting feeling sick to her stomach.

19          60.     This conversation had a devastating effect on Plaintiff. Her significant other had

20  just been summarily terminated for undisclosed reasons after performing at a high level and

21  being in discussions about a promotion to the detective unit. And now she was being ordered to

22  meet with Sokoloff just so he could tell her that he was responsible for Luckey's termination,

23  that he was influential with the Department higher-ups, and that those higher-ups had doubts

24  about her loyalty and were watching her. She felt alone and that everyone was against her and

25  assuming the worst about her.

26          61.     Then on October 11, 2021, Plaintiff was called into Sokoloff's office again. Sgt.

27  Lara was there as well. Plaintiff was presented with a Personnel Incident Report ("PIR").

28

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

1   Sokoloff told her that the reason for the write up was because her body camera was not on during

2   the September 28 traffic stop described above, and because she had not immediately booked the

3   license plate into the Evidence System. Plaintiff was alarmed and confused. She had informed

4   her immediate supervisor, Sgt. Lara, that the body camera had failed to operate properly at the

5   time of the incident and Sgt. Lara had explicitly approved of Plaintiff securing the license plate

6   in the Evidence Locker and entering it into the system during her next shift.

7       62.    During that meeting, Sokoloff became visibly angry and told Plaintiff, "I foresee

8   that in the near future you're going to get fired, just like Luckey did." Plaintiff began to panic.

9   She took Sokoloff's threat as very real because it was consistent with the way he had been

10  treating her and what he had been telling her. She now believed she was on thin ice - no longer

11  valued or held in regard by her supervisors or the administrators they reported to. She believed

12  her termination was inevitable.

13      63.    Plaintiff signed the PIR and left the room, then went out to her vehicle and broke

14  down crying. She phoned Sgt. Gray, her immediate supervisor and the PPD Union Rep, and told

15  him everything that had just happened. She asked if it was grounds for her termination. Sgt. Gray

16  replied that he was not aware of any justification for her termination.

17      64.    Sgt. Gray, on his own initiative, went to Capt. Barteau about a week later to

18  complain about Sokoloff's threat to terminate Plaintiff. He told Capt. Barteau he believed that

19  Sokoloff was saying these things just to torment and stress Plaintiff, because as Plaintiff's

20  current supervisor, Sgt. Gray could attest that there were absolutely no issues related to Plaintiff

21  to warrant discipline, let alone termination. He told Barteau that Plaintiff was in his opinion

22  extremely stressed, and then asked Barteau to tell Sokoloff to knock it off. Capt. Barteau assured

23  Sgt. Gray he would put an end to it. At the time, Sgt. Gray was nearly finished with his

24  probationary period as a recently promoted sergeant. Within days of this meeting, he received

25  word that his probationary period had been extended for unknown reasons. He understood that

26  being placed on a longer probation was in retaliation intervening to stop the harassment. He

27  never witnessed any indication that Barteau had even spoken with Sokoloff about Sokoloff's

28

harassment of Plaintiff.

65.     The following day, October 12, Sokoloff approached her with a smirk while she was writing up a report. He asked Plaintiff how she "felt" about the PIR meeting. She replied that she did not have a good feeling. He then told her that he "wanted to see how it affected" her, and that he wanted to "scare" her. Then he asked Plaintiff if she intended to apply for a position elsewhere. Plaintiff asked if he was implying that she *should* apply out for another position, and Sokoloff gave the vague response, "That's up to you."

66.     Officers with PPD, including lieutenants and captains, routinely conduct traffic stops without wearing a body camera. In fact, Sokoloff himself on November 8, 2021, conducted a traffic stop without being equipped with a body camera. In light of this, writing up a formal PIR against Plaintiff for this same thing was unwarranted and abusive. Moreover, Defendant Sokoloff admitted he had done it intentionally and for the express purpose of upsetting and scaring her.

67.      As stated above, after the October PIR, Plaintiff was reasonably convinced that her supervisors were creating a formal paper trail to justify firing her, subjecting her to unjust and unwarranted discipline, and informing her that they saw her termination in the near future. The constant fear of unexpected discipline and possible termination became untenable. Plaintiff believed if she waited for PPD to find or manufacture a final cause for her termination, it would be entered into her personnel file and potentially end her law enforcement career. Accordingly, she felt she had to find alternate employment as soon as possible before she was fired. She began quietly searching for openings at other area agencies.

68.     Sokoloff's harassing, retaliatory campaign continued through the fall of 2021 and the winter of 2022, but Plaintiff kept a low profile while remaining stressed and hyper-vigilant, striving to avoid any benign or common slip-up that could cause her dismissal.

69.     In or around January 2022, a suitable position was announced with her former employer, the County of Tulare District Attorney's Office Bureau of Investigations. Plaintiff applied for it. The position paid less than what Plaintiff was making as an officer at PPD, but

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

1    Plaintiff was willing to earn less just to be free from the anxiety, hostility, and harassment she

2    was experiencing at PPD. She was scheduled for an interview in February 2022.

3         70.    On January 29, 2022, Plaintiff put in a request for a two-week vacation in

4    February for her children's birthdays and a family vacation. On February 3, 2022, her vacation

5    request was approved by Cpl. Ochoa, who signed and submitted it to PPD administration.

6         71.    That same day her vacation was approved, Plaintiff was stopped by Lieutenant

7    Gurule, who asked Plaintiff about a rumor circulating that she had an upcoming interview with

8    another agency. Plaintiff informed Lt. Gurule that she did have an interview, but that she was

9    just weighing her options. Plaintiff now knew that PPD administrators were aware of her

10   interview and her plans to leave before being fired.

11        72.    Later that afternoon, Plaintiff was told that her approved vacation had just been

12   cancelled by Lt. Gurule. Plaintiff was very upset and complained to Cpl. Ochoa, as cancelling a

13   vacation after it has been formally approved by shift supervisors is typically not allowed. She

14   was told that the reason given was Lt. Gurule's suspicion that Plaintiff would serve two-weeks'

15   notice while on vacation. Plaintiff believed her vacation was cancelled to prevent her from

16   attending the interview with another employer.

17        73.    That evening during the same shift, Sokoloff called Plaintiff to his office. He told

18   Plaintiff that he had instructed Lt. Gurule to ask Plaintiff about applying to another agency and

19   report back on what Plaintiff said. Here again, Sokoloff was spying on Plaintiff and now

20   enlisting other superior officers to assist him. He then told her that he was cancelling her

21   vacation, but that she could submit a new request for a <u>one-week</u> vacation some time in March,

22   *after* her children's birthdays.

23        74.    Then, on February 4, 2022, Plaintiff was called into a meeting with her immediate

24   supervisors, Cpl. Ochoa and Sgt. Pinheiro, and informed that they needed to perform routine

25   administrative review of an incident that occurred that day in which her K-9 partner bit a plain-

26   clothes TCSO detective while apprehending a suspect hiding in a slough. Sgt. Pinheiro said he

27   was there just to assist Cpl. Ochoa because Ochoa had not done these reviews before. Both

28

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

supervisors assured Plaintiff not to worry, that it was simply a protocol done for any K-9 arrest that results in a bite. During the course of their review, Defendant Sokoloff entered the room to speak with Pinheiro and Ochoa, so Plaintiff stepped out and the door was closed. A few minutes passed, and Plaintiff was called back in. Sokoloff informed Plaintiff that the incident was no longer going to simply be an administrative review, but instead would be an Internal Affairs "("IA") investigation. Based on the immediate circumstances and Sokoloff's statements, Plaintiff understood that the IA investigation was at his directive.

75.    Plaintiff was in the initial stages of her application for employment with the District Attorney's Office. She knew that any discipline pursuant to an IA investigation would disqualify her for the position and, upon information and belief, Sokoloff knew this, too. Moreover, she knew that PPD administrators were aware of her application. Accordingly, she requested legal representation for the investigation. Sokoloff told Plaintiff that if she had nothing to hide, she should not need legal representation. He encouraged her to simply do the interviews without an attorney and "get them out of the way." Plaintiff told Sokoloff she knew that other K-9 handlers did not face similar repercussions when they had accidental bites.

76.    Sokoloff agreed to have Sgt. Pinheiro conduct the investigation, and ultimately Plaintiff was found to have complied with all policies and procedures and cleared of any wrongdoing.

77.    Based on all of the foregoing, Plaintiff reasonably concluded that she had no choice but to resign from the PPD before Sokoloff destroyed her professional reputation and her career.  She completed the interview and application process with Tulare County District Attorney's Office and was offered the position, which she immediately accepted.

78.    Plaintiff's last day at the PPD was March 26, 2022. During her exit interview with Lt. Ron Moore, Plaintiff was asked to state why she was leaving. Plaintiff told Lt. Moore that "she felt like she has been on 'thin ice' for quite some time now." When Lt. Moore asked what she meant by that, she replied, "How else should I feel when I'm brought into this office and told I was close to getting fired?" Lt. Moore asked who had told her this or what had prompted that

1    conversation. Plaintiff did not feel safe divulging Sokoloff's name when informing Lt. Moore

2    about the abusive treatment she had received. Nonetheless, Lt. Moore wrote that "[i]t was my

3    impression that without specifically saying it, she was referring to Lieutenant Sokoloff and/or

4    Lieutenant Gurule."

## FIRST CAUSE OF ACTION: SEX DISCRIMINATION
## IN VIOLATION OF TITLE VII
### (Against Defendant City of Porterville)

7        79.    Plaintiff incorporates herein the allegations set forth above.

8        80.    Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of a

9    person's sex.

10       81.    Plaintiff is a woman and was employed in a position for which she was fully

11   qualified.

12       82.    As set forth above, Plaintiff was subjected to a repeated and pervasive pattern of

13   sex-based harassment from three male supervisors, including but not limited to yelling,

14   unwelcome sexual advances, followed by hazing, hostile silence, humiliation in front of peers,

15   unwarranted criticism, excessive scrutiny and surveillance, intentional risks to her personal

16   safety on the job, baseless discipline, and threats of termination. The harassment was intentional,

17   and so severe and pervasive that it created a hostile work environment. It interfered with nearly

18   every aspect of Plaintiff's work, because rather than simply being able to perform and grow as an

19   officer, she had to continually navigate the egos of her male superiors and endure the anger

20   caused by her refusal to submit to them sexually.

21       83.    In addition, Plaintiff was denied the ability to learn, grow, and advance in her

22   career with PPD because the same supervisors from whom Plaintiff should have been able to

23   seek guidance and support were also the perpetrators who were discriminating and retaliating

24   against her. Continually harassed and threatened with termination, Plaintiff had no choice but to

25   protect her reputation and livelihood by seeking a position outside PPD and submitting her

26   resignation.  In effect, the retaliation and harassment to which Plaintiff was being subjected

27

28

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

resulted in Plaintiff's constructive discharge.[2]

84.    The circumstances surrounding Plaintiff's constructive discharge give rise to the inference of sex discrimination based on the fact that, due to her status as a woman, Plaintiff was viewed by her male supervisors as an object of sexual and/or romantic interest rather than as a junior officer for whom they should have only professional interest and that the rejection by Plaintiff of their sexual and/or romantic interest was the direct cause of the discriminatory treatment to which she was being subjected. "Simply put, if she were a man, [Plaintiff] would not have experienced this harassment" described above.[3]

85.    Defendant City of Porterville is strictly liable for Sokoloff's illegal conduct due to the fact that he was acting as Plaintiff's supervisor.

86.    As a result of Defendant's violations of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

**SECOND CAUSE OF ACTION:**
**RETALIATION IN VIOLATION OF TITLE VII**
**(Against Defendant City of Porterville)**

87.    Plaintiff incorporates herein the allegations set forth above.

88.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e, *et seq.,* prohibits retaliation against an employee who opposes or reports sex discrimination.

89.    As described more fully above, Plaintiff engaged in the protected activity of opposing the sexual harassment directed at her by Sokoloff, her supervisor throughout December 2020. After Plaintiff rebuffed Sokoloff's sexual overtures, Sokoloff responded by retaliating

---

[2] Constructive discharge is recognized to be an adverse employment action under both federal and state law. *See e.g. Pennsylvania State Police v. Suders* (2004) 542 U.S. 129, 143 ("Title VII encompasses employer liability for a constructive discharge"); *Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1253 ("Constructive discharge, like actual discharge, is a materially adverse employment action." )

[3] Sampson v. County of Los Angeles, 2020 WL 5405672 (9th Cir. 2020)

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

against Plaintiff. As described more fully above, Sokoloff's retaliation consisted of a continuous pattern of intentional harassment such that Plaintiff's working conditions became so intolerable that she accepted a lower-paid position with her former employer as soon as it became available. In effect, the retaliation and harassment to which she was being subjected resulted in Plaintiff's constructive discharge.

90.    Defendant City of Porterville is strictly liable for Sokoloff's illegal conduct due to the fact that he was acting as Plaintiff's supervisor.

91.    As a result of Defendant's violations of 42 U.S.C. section 2000e, *et seq.,* Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

### THIRD CAUSE OF ACTION: DEPRIVATION OF CIVIL RIGHTS
### IN VIOLATIONS OF 42 U.S.C SECTION 1983
### (Against Defendants City of Porterville)

92.    Plaintiff incorporates herein the allegations set forth above.

93.    42 U.S.C. section 1983 creates a private right of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

94.    At all times that Sokoloff engaged in the sex-based discrimination, harassment, and retaliation against Plaintiff described at length above, he acted under color of state law.

95.    These acts of Sokoloff deprived Plaintiff of her particular rights under the Constitution and the laws of the United States.

96.    Sokoloff acted pursuant to a widespread practice or custom of the Porterville Police Department, of which the Porterville Police Chief Jake Castellow and the Porterville City Council have had actual knowledge. This widespread practice or custom consisted of repeated constitutional violations in the form of sexual harassment, sex discrimination, and retaliation

against female police officers which were never properly investigated and for which the violators were never disciplined or reprimanded. Instead, the Porterville Police Chief and the Porterville City Council have consistently absolved the violators of wrongdoing; promoted the violators to positions in the Department above their victims; voted to uphold the unlawful termination of female complainants after hearings; and ferociously defended the multiple judicial and administrative actions brought by female officers.

97.    This widespread practice or custom of the Porterville Police Department caused the deprivation of Plaintiff's rights by Sokoloff.

98.    As a result of Defendant's violations of section 1983, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

99.    In light of the evidence that Defendants acted with malice or evil intent, or with reckless or callous indifference to the Plaintiff's federally protected rights in violation of section 1983, Plaintiff requests an award of punitive damages in an amount according to proof.

**FOURTH CAUSE OF ACTION: SEX DISCRIMINATION**
**IN VIOLATION OF THE FEHA**
**(Against Defendant City of Porterville )**

100.    Plaintiff incorporates herein the allegations set forth above.

101.    California's Fair Employment and Housing Act ("FEHA"), California Government Code Section 12900, *et. seq*., prohibits discrimination on the basis of a person's sex. Sex harassment has been recognized as a form of sex discrimination.

102.    Plaintiff is a woman and was employed in a position for which she was fully qualified.

103.    As set forth above, Plaintiff was subjected to a repeated and pervasive pattern of sex-based harassment from three male supervisors to which her male co-workers were not subjected, including but not limited to yelling, unwelcome sexual advances, followed by hazing, hostile silence, humiliation in front of peers, unwarranted criticism, excessive scrutiny and surveillance, intentional risks to her personal safety on the job, baseless discipline, and threats of

1    termination. The harassment was intentional, and so severe and pervasive that it created a hostile

2    work environment. It interfered with nearly every aspect of Plaintiff's work, because rather than

3    simply being able to perform and grow as an officer, she had to continually navigate the egos of

4    her male superiors and endure the anger caused by her refusal to submit to them sexually.

5         104.    In addition, Plaintiff was denied the ability to learn, grow, and advance in her

6    career with PPD because the same supervisors from whom Plaintiff should have been able to

7    seek guidance and support were also her perpetrators. Continually harassed and threatened with

8    termination, Plaintiff had no choice but to protect her reputation and livelihood by seeking a

9    position outside PPD and submitting her resignation.

10         105.    The circumstances surrounding Plaintiff's constructive discharge give rise to the

11    inference of sex discrimination based on the fact that, due to her status as a woman, Plaintiff was

12    viewed by her male supervisors as an object of sexual and/or romantic interest rather than as a

13    junior officer for whom they should have only professional interest; and that the rejection by

14    Plaintiff of their sexual and/or romantic interest was the direct cause of the discriminatory

15    treatment to which she was being subjected. "Simply put, if she were a man, [Plaintiff] would

16    not have experienced this harassment" described above.[4]

17         106.    Defendant City of Porterville is strictly liable for Sokoloff's illegal conduct due to

18    the fact that he was acting as Plaintiff's supervisor.

19         107.    As a result of Defendant's violations of the FEHA, Plaintiff has suffered, and will

20    continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of

21    life, emotional distress, and damage to her health and personal and professional reputations.

22         **FIFTH CAUSE OF ACTION:**

     **RETALIATION IN VIOLATION OF THE FEHA**

23         **(Against Defendant City of Porterville)**

24         108.    Plaintiff incorporates herein the allegations set forth above.

25         109.    California's Fair Employment and Housing Act ("FEHA"), California

26    Government Code Section 12900, *et. seq*., prohibits retaliation against an employee who opposes

27

28         [4] Sampson v. County of Los Angeles, 2020 WL 5405672 (9th Cir. 2020).

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND

discrimination on the basis of a person's sex.

110.    As described more fully above, Plaintiff engaged in the protected activity of opposing the sexual harassment directed at her by Sokoloff, her supervisor throughout December 2020. After Plaintiff rebuffed Sokoloff's sexual overtures, Sokoloff responded by retaliating against Plaintiff. Sokoloff's retaliation consisted of a continuous pattern of intentional harassment such that Plaintiff's working conditions became so intolerable that she accepted a lower-paid position with her former employer as soon as it became available. In effect, the retaliation and harassment to which she was being subjected resulted in Plaintiff's constructive discharge.

111.    Defendant City of Porterville is strictly liable for Sokoloff's illegal conduct due to the fact that he was acting as Plaintiff's supervisor.

112.    As a result of Defendant's violations of the FEHA, Plaintiff has suffered, and will continue to suffer, damages, including, but not limited to, loss of income, loss of enjoyment of life, emotional distress, and damage to her health and personal and professional reputations.

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.    For compensation for lost income and related employment benefits, past and future, according to proof;

B.    For special damages according to proof;

C.    For compensatory damages for mental and emotional distress;

D.    For reasonable costs and attorney's fees;

E.    For prejudgment interest from the date of Plaintiff's constructive termination;

F.    An injunction requiring the City of Porterville to reinstate Plaintiff to a position to which by now she would have been promoted but for the discrimination and retaliation to which she was subjected and to revise its policies and practices to eliminate the hostile and discriminatory culture at the Porterville Police Department and to institute a fair and non-discriminatory promotion process.

G.    The appointment Special Master or Monitor to ensure the City of Porterville carries out the orders of this Court;

H.    For such other and further relief that the Court may deem just and proper.


Dated:  November 9, 2024                    Respectfully submitted,


                                            LAW OFFICES OF LAWRENCE J. KING


                                            By: ___/s/_____
                                                    Lawrence J. King

PLAINTIFF'S THIRD AMENDED COMPLAINT & JURY DEMAND