1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ANA ISABEL MORENO,                     Case No.  1:23-cv-00541-BAM

12                  Plaintiff,              ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANT'S
13         v.                               MOTION TO STRIKE PORTIONS OF
                                            PLAINTIFF'S THIRD AMENDED
14   CITY OF PORTERVILLE, et al.,           COMPLAINT

15                  Defendants.             (Doc. 47)

16                                          ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANT'S
17                                          MOTION TO DISMISS PLAINTIFFS'
                                            THIRD AMENDED COMPLAINT
18
                                            (Doc. 48)
19

20         Plaintiff alleges that she was subjected to discrimination and retaliation while employed

21   by the Porterville Police Department.  On November 8, 2024, following dismissal of the second

22   amended complaint, Plaintiff filed a third amended complaint against the City of Porterville.

23   (Doc. 42.)  Currently before the Court are: (1) Defendant's motion to strike portions of Plaintiff's

24   third amended complaint under Rule 12(f) of the Federal Rules of Civil Procedure, (Doc. 47); and

25   (2) Defendant's motion to dismiss the third amended complaint in its entirety pursuant to Rule

26   12(b)(6), (Doc. 48).  Plaintiff opposed both motions on January 17, 2025.  (Docs. 58, 59.)

27   Defendant filed replies on January 31, 2025.  (Docs. 60, 61.)  The Court found the motions

28   suitable for decision without oral argument pursuant to Local Rule 230(g), and the matter has

1  been submitted on the record.[1]

2      For the reasons set forth below, Defendant's motion to strike will be granted in part and

3  denied in part and Defendant's motion to dismiss will be granted in part and denied in part.

4      **I.      Procedural Background**

5      Plaintiff initiated this action on April 6, 2023, against the City of Porterville and Bruce

6  Sokoloff.  (Doc. 1.)  Thereafter, Plaintiff filed a first amended complaint, (Doc. 15), and a second

7  amended complaint, (Doc. 19).

8      Plaintiff's second amended complaint asserted claims for (1) sex discrimination in

9  violation of Title VII against Defendant City of Porterville, (2) retaliation in violation of Title VII

10  against Defendant City of Porterville, (3) deprivation of civil rights in violation of 42 U.S.C. §

11  1983 against Defendants City of Porterville and Sokoloff, (4) sex discrimination in violation of

12  the California Constitution against Defendant City of Porterville, (5) sex discrimination in

13  violation of the Fair Employment and Housing Act ("FEHA") against Defendant City of

14  Porterville, and (6) retaliation in violation of FEHA against Defendant City of Porterville.  (Doc.

15  19.)  Defendants City of Porterville and Bruce Sokoloff filed a motion to dismiss the complaint

16  under Rule 12(b)(6).  (Doc. 20.)

17      On September 30, 2024, the Court granted Defendants' motion to dismiss the second

18  amended complaint.  (Doc. 36.)  As to Plaintiff's first (Title VII) and fifth claims (FEHA) for sex

19  discrimination, the Court found that Plaintiff had essentially conceded she had not stated a

20  cognizable sex discrimination claim premised on a disparate treatment theory and granted

21  Defendants' motion to dismiss the claims based on disparate treatment without leave to amend.

22  (Doc. 36 at 6, 21.)  However, as to Plaintiff's sex discrimination claims based on a hostile work

23  environment theory, the Court granted Defendant's motion to dismiss with leave to amend.  (*Id.*

24  at 10, 21.)

25      As to Plaintiff's second (Title VII) and sixth claims (FEHA) for retaliation, the Court

26  found that, at the pleading stage, Plaintiff sufficiently alleged the existence of an adverse

27  _____

28  [1] The parties have consented to magistrate judge jurisdiction over this action for all purposes, including trial and entry of final judgment, pursuant to 28 U.S.C. § 636(c)(1).  (Docs. 24, 25, 26, 28.)

employment action only as to three of Plaintiff's six alleged adverse employment actions described in the SAC:  (1) when she received a formal write up in November 2021; (2) when her vacation request was cancelled in February 2022; and (3) when she was subjected to an internal affairs investigation in February 2022.  (Doc. 36 at 14.)  However, the Court found that Plaintiff failed to sufficiently allege causation as to any of the adverse employment actions and dismissed the retaliation claims with leave to amend.  (*Id.* at 15.)

As to Plaintiff's third claim for deprivation of civil rights in violation of 42 U.S.C. § 1983, the Court found that Plaintiff's allegations were conclusory and insufficient to state a *Monell* claim against the City of Porterville based upon a theory of ratification.  The Court dismissed the claim with leave to amend.  (Doc. 36 at 15-16, 21.)

Additionally, the Court denied Plaintiff leave to amend her claim for money damages against Defendant Sokoloff in his individual capacity for allegedly infringing on Plaintiff's right to intimate association and denied Plaintiff leave to amend her claim for sex discrimination in violation of Article 1, Section 1 of the California Constitution.  (Doc. 36 at 19-21.)

Plaintiff filed her third amended complaint against the City of Porterville on November 8, 2024.  (Doc. 42.)  On December 6, 2024, Defendant moved to strike certain portions of Plaintiff's third amended complaint under Rule 12(f) as immaterial and impertinent.  (Doc. 47.)  Defendant also moved to dismiss all claims for relief in the third amended complaint under Rule 12(b)(6).

## II.    Summary of Third Amended Complaint

### Claims for Relief

Plaintiff forwards the following claims against the City of Porterville (as the sole defendant): (1) sex discrimination in violation of Title VII; (2) retaliation in violation of Title VII; (3) deprivation of civil rights under 42 U.S.C. § 1983; (4) sex discrimination in violation of FEHA; and (5) retaliation in violation of FEHA.  (Doc. 42 Third Amended Complaint ("TAC").)

### Summary of Plaintiff's Allegations Against Bruce Sokoloff

On September 3, 2019, Plaintiff accepted a position as a Peace Officer with the Porterville Police Department ("PPD").  (TAC ¶ 22.)  On March 1, 2020, Sokoloff became Plaintiff's supervising Sergeant.  Between March 1, 2020, and December 2020, she worked closely with him

and grew to consider him a mentor.  (*Id.* ¶ 27.)  She alleges, however, that Sokoloff began making demeaning sexual comments and inappropriate advances to Plaintiff.  On April 19, 2020, after she arrested a man for public masturbation, she alleges Sokoloff messaged her: "He may think of u next time he plays with himself."  (*Id.* ¶ 28.)  Then, on May 17, 2020, Sokoloff texted Plaintiff a picture of a beer and wrote, "When u don't have your kids after work I'll share one with u."  (*Id.*)

Plaintiff alleges that throughout the month of December 2020, Sokoloff engaged in a "persistent and unwelcome romantic pursuit" of Plaintiff.  (TAC ¶ 31.)  On December 7, 2020, he texted Plaintiff repeatedly to ask her to have drink outside of work that weekend.  On December 9, 2020, he again texted Plaintiff repeatedly saying that if she was not working, she should get together with him for a drink.  On December 11, 2020, he again repeatedly texted Plaintiff saying that he was going to be alone that weekend because his wife and children would be in Los Angeles.  Plaintiff replied that if he was going to be alone, she would not have a drink with him because she felt it would be inappropriate and suggested to Sokoloff that it would upset his wife. Sokoloff responded that if Plaintiff came to his house for drinks, he was not going to tell his wife. He then followed up immediately with a text telling Plaintiff that if she wanted to be a Field Training Officer ("FTO"), he "knew the sergeant really really well," suggesting he could do her favors or help her career.  Plaintiff went to Sokoloff's house for dinner and drinks on December 12, 2020, and she brought a friend because she felt uncomfortable and did not want to be alone with him.  (*Id.*)

Plaintiff alleges that on December 28, 2020, Sokoloff began "a three-day siege of numerous, harassing text messages," attempting to get Plaintiff to go away alone with him out of town over New Year's weekend, which made Plaintiff "extremely uncomfortable" because he was her supervisor.  (TAC ¶ 32.)  Sokoloff began by texting Plaintiff saying he would be free New Year's weekend and they should spend it together.  He said his family would be out of town and suggested they go to Ventura and stay in a hotel.  Although she declined the invitation, Plaintiff alleges that Sokoloff persisted.  (*Id.*)  He wrote, "So since u said no to Ventura. . . how bout Vegas for NYE?"  She again refused.  He wrote back, "it's only 5 hrs. . . I'll have u back by briefing."  Plaintiff again declined, and Sokoloff responded, "Freakin call in with Corona

symptoms.  That'll get you an extra day, and "[R]emember, your shift has the staffing so don't feel bad if you call in sick." (*Id.* ¶ 33.)  Sokoloff continued to pester Plaintiff with repeated texts over the next three days insisting she spend New Year's Eve with him, telling her to trade shifts with another officer and suggesting she tell PPD her children were sick and that she needed to care for them.  Plaintiff told Sokoloff she would not do these things.  He said he would put on his uniform and come into work despite being on vacation, "if that's the only way we can have dinner." (*Id.* ¶ 34.)  At 4:26 p.m. on December 31, Plaintiff texted Sokoloff telling him that her mother's family had just showed up and she would not be able to come over.  He replies, "Tell your mom u have a hot date and you'll see her later."  When Plaintiff replied that she would not do that, Sokoloff wrote, "You're one tough girl to meet up with.  There's steam coming off the spa already.  If anything changes and u can get outta there. . . I'll be home." (*Id.*)  Plaintiff alleges she experienced fear and apprehension when going to work because of Sokoloff's advances.  She also claims that she was denied the normal professional mentoring relationship that male PPD junior officers enjoyed with their supervisor, which "necessarily interfered with her job performance as well as her ability to obtain the guidance and support necessary to advance." (*Id.* ¶ 35.)

Plaintiff alleges Sokoloff's behavior and demeanor toward her started to change in "mid to late January 2021," shortly after she rebuffed him.  (TAC ¶ 36.)  For example, on February 11, 2021, Sokoloff allegedly belittled Plaintiff in front of her colleagues and falsely accused her of gross incompetence, telling her she "can't do shit right." (*Id.* ¶ 37.)

Between March and September 2021, Sokoloff "created an increasingly hostile work environment" after it became known that Plaintiff and Officer Luckey were romantically involved. (TAC ¶ 49.)  Plaintiff alleges that she had anxiety about going to work and being around Sokoloff as a result.  (*Id.*)  On March 10, 2021, Sokoloff stated a 5150 mental hold report Plaintiff prepared was "not acceptable."  Plaintiff claims she was held to a different standard than her male co-workers.  (*Id.* ¶ 38.)  On March 11, 2021, Sokoloff began hazing Plaintiff about her arrests and warned her that he was going to find a "nasty transient" for her to arrest and transport to the jail.  (*Id.* ¶ 39.)  About an hour before the end of her shift, Sokoloff radioed Plaintiff and

ordered her to his location. When Plaintiff arrived, Sokoloff was with an intoxicated male transient, whose pants sagged and exposed his genitalia and buttocks. Plaintiff alleges Sokoloff put her in "a dangerous situation" by leaving her alone at the scene, ordering her to perform a field sobriety screen, and to transport the transient to jail. (TAC ¶ 40.) Plaintiff had a canine in the back of her vehicle and had to put the transient in the front seat. (*Id.* ¶¶ 39, 41-42.) After leaving Plaintiff alone with the transient, Sokoloff went back to the Department and told Plaintiff's fellow officers what he had done. (*Id.* ¶ 43.)

On July 21, 2021, Sokoloff told Plaintiff that he needed her camera to perform a property audit after she worked a traffic collision report and needed to take photographs. (TAC ¶ 50.) Around this time, Sokoloff told Plaintiff that she had "changed" and accused her of missing work a lot. (TAC ¶ 51.)

On August 1, 2021, Sokoloff messaged Plaintiff to tell her that he was being promoted from Sergeant to Lieutenant. He wrote, "Just make sure u don't get wrapped up in an [Internal Affairs investigation] I have to do." (TAC ¶ 52.)

On August 18, 2021, Plaintiff was sent home ill and ordered to take a COVID test. She went with Officer Luckey to get tested for COVID. She tested positive and Officer Luckey tested negative. When she told Sokoloff the results, he grew angry and told her that Officer Luckey was not allowed to be at her house and or to have any contact with her. (TAC ¶ 53.)

On September 30, 2021, Officer Luckey was terminated as a result of an Internal Affairs investigation initiated and conducted by Sokoloff. (TAC ¶ 57.) The next day, September 31, 2021,[2] Plaintiff was directed to report to Sokoloff. He informed Plaintiff that he was the one who had initiated and conducted the Internal Affairs investigation that resulted in Officer Luckey's termination. Sokoloff allegedly told Plaintiff that Department administrators were now keeping an eye on her and that she would be under scrutiny for possible negative response to Officer Luckey's termination. (*Id.* ¶ 58.) Sokoloff then began telling Plaintiff that he had significant influence in the Department because of his close friendship with Captain Barteau. Sokoloff

---

[2] This date appears to be incorrect. There are only 30 days in the month of September.

allegedly said that although "the Administration was worried" about her reaction to Officer Luckey's termination, he believed she could still promote and potentially have a successful career there.  Plaintiff understood that he was telling her that if she wanted to continue her career at the PPD, she needed to make Sokoloff happy and act like she was not upset with or mistrustful of him.  (*Id.* ¶ 59.)

On October 11, 2021, Plaintiff was called into Sokoloff's office again.  Plaintiff was presented with a Personnel Incident Report ("PIR") because her body camera was not on during a September 28 traffic stop, and because she had not immediately booked the license plate from the stop into the Evidence System.  (TAC ¶ 61.)  During the meeting, Sokoloff became visibly angry and told Plaintiff, "I foresee that in the near future you're going to get fired, just like Luckey did."  She reportedly believed her termination was inevitable. (*Id.* ¶ 62.)  The following day, Sokoloff asked Plaintiff how she felt about the PIR meeting.  Sokoloff reportedly told Plaintiff that he "wanted to see how it affected" her, and that he wanted to "scare" her. (*Id.* ¶ 65.)  Sokoloff then asked if she intended to apply for a position elsewhere. Plaintiff asked if he was implying that she should apply out for another position, and Sokoloff gave the vague response, "That's up to you."  (*Id.*)

Plaintiff alleges that Sokoloff continued a "harassing, retaliatory campaign" through the fall of 2021 and winter of 2022, but Plaintiff "kept a low profile."  (TAC ¶ 68.)  On January 29, 2022, Plaintiff requested a two-week vacation in February.  (*Id.* ¶ 70.)  On February 3, 2022, her vacation request was approved by Cpl. Ochoa. (*Id.*)  Later that day, Lieutenant Gurule asked Plaintiff about a rumor that she had an upcoming interview with another agency, and Plaintiff informed him that she did have an interview but was just weighing her options. (*Id.* ¶ 71.)  Later that afternoon, Plaintiff was told that her vacation request had been canceled by Lieutenant Gurule because he was suspicious that Plaintiff would serve two-weeks' notice while on vacation.  (*Id.* ¶ 72.)  That evening, Sokoloff called Plaintiff into his office and told her he was canceling her vacation but that she could submit a new request for a one-week vacation in March. (*Id.* ¶ 73.)

On February 4, 2022, Plaintiff's immediate supervisors informed her there would be a "routine administrative review of an incident that occurred that day in which her K-9 partner bit a

1    plainclothes TCSO detective while apprehending a suspect hiding in a slough." (TAC ¶ 74.)

2    During the course of the review, Sokoloff informed Plaintiff that the incident was going to be an

3    Internal Affairs investigation. (*Id.*)  Plaintiff was found to have complied with all policies and

4    procedures and cleared of any wrongdoing. (*Id.* ¶ 76.)  Plaintiff felt she had no choice but to

5    resign before Sokoloff allegedly "destroyed her professional reputation." (*Id.* ¶ 77.) Plaintiff's last

6    day with PPD was March 26, 2022. (*Id.* ¶ 78.)

7    <u>Summary of Plaintiff's New Allegations Involving Other Supervisors</u>

8    For the first time in this action, Plaintiff now alleges that she "was subjected to repeated

9    unwelcome sexual advances" from two other direct supervisors while employed by the City of

10    Porterville. (TAC ¶ 8.)

11    Plaintiff alleges that Sgt. E. Martinez was assigned as her direct supervisor, that he yelled

12    at Plaintiff in front of her fellow officers on several occasions, but he did not criticize her male

13    co-workers in front of other employees. (TAC ¶ 23.)  Plaintiff also alleges that on December 15,

14    2019, while attending a social gathering, she was met outside by Sgt. Martinez, who appeared to

15    be intoxicated.  Sgt. Martinez spoke to Plaintiff and allegedly said: "So if I say do this, it means

16    you just do it. And if I say 'Let's fuck,' it means let's fuck." (*Id.* ¶ 24.)  Plaintiff did not respond,

17    and she never addressed it with Sgt. Martinez. (*Id.* ¶¶ 25, 26). She reportedly learned that Sgt.

18    Martinez had been telling fellow male officers to be "careful" around Plaintiff because she was

19    "the type who would file a complaint," causing Plaintiff to be alienated from her fellow officers.

20    (*Id.* ¶ 26)

21    Plaintiff also alleges that Corporal Enrique Lara was her other supervisor, and that he was

22    "initially openly hostile to Plaintiff" and would ignore her when she asked him questions, but she

23    never saw him ignore male officers. (TAC ¶ 30.)  Beginning in or around December

24    2020/January 2021, Plaintiff alleges Cpl. Lara sent her unsolicited pictures and messages asking

25    her to spend time alone with him, to which she did not respond. (*Id.* ¶ 44.)  On February 23, 2021,

26    Cpl. Lara confronted Plaintiff at work about not replying to a video or to a personal message that

27    he had sent her.  Plaintiff alleges that he wanted Plaintiff to explain why she had not responded to

28    his personal overtures, which made Plaintiff "extremely uncomfortable." (*Id.* ¶ 45.)  On March 1,

2021, Plaintiff alleges she "documented that Cpl. Lara was ignoring her because she had not responded" to his inappropriate messages.  (*Id.* ¶ 46.)  On May 14, 2021, Cpl. Lara allegedly sent Plaintiff a video of himself naked from the waist up, drinking a beer, and asking her to come to his residence to swim alone with him, which she declined. (*Id.* ¶ 47.)

On September 28, 2021, after returning to patrol, Plaintiff located an unoccupied vehicle with a license plate belonging to a different vehicle. (TAC ¶ 56.)  When the vehicle later drove away, Plaintiff conducted a stop.  Her body camera had not been recording, and she explained to Sgt. Lara that she did not know why it was not recording and then continued with her investigation. Sgt. Lara expressed no concern about the camera.  Plaintiff removed the license plate from the vehicle and placed it in the PPD Evidence Locker. (*Id.*)

### III.    Defendant's Motion to Strike Portions of Plaintiff's Third Amended Complaint

Defendant indicates that: Plaintiff sued the City of Porterville based on actions related to her employment as a police officer with the City; she contends her former supervisor, Sokoloff, retaliated against her for "rejecting his sexual overtures," forcing Plaintiff to eventually quit; she asserts claims based on Title VII, FEHA, and violations of the United States Constitution; and on September 30, 2024, the Court granted Plaintiff leave to file the TAC for a "final opportunity." (Doc. 47 at 13, citing Doc. 36 at 20.)  Defendant now asserts that Plaintiff filed the TAC, "but included allegations that are alleged, *inter alia*, (i) notwithstanding the Court's order to dismiss Plaintiff's sex harassment claim based on disparate treatment [with][3] prejudice; (ii) redundant, immaterial, and impertinent allegations related to conduct by officers other than Sokoloff – to which Plaintiff failed to include as part of her EEOC/DFEH complaint such that she failed to exhaust her administrative remedies as to such allegations; (ii) irrelevant and immaterial allegations related to conduct the Court already found that no adverse employment actions occurred; and (iv) notwithstanding the Court's finding that Plaintiff voluntarily resigned and was

---

[3] Defendant states the Court's dismissal of the sex harassment claim was based on disparate treatment "without prejudice."  (Doc. 47 at 13.)  This appears to be a typographical error by Defendant as the Court dismissed the claims based on disparate treatment "without leave to amend." (Doc. 36 at 6, 21.)

1  not constructively discharged." (*Id.*)

2  In particular, Defendant contends that Plaintiff's disparate treatment allegations

3  (paragraphs 2-7 and paragraph 38, line 11) are barred by the Court's order dismissing the claims

4  without leave to amend; Plaintiff's allegations as to Sgt E. Martinez (paragraph 8, line 18 and

5  paragraphs 23-26) are barred by the failure to exhaust administrative remedies; Plaintiff's

6  allegations as to Sokoloff's pre-December 2020 conduct (paragraph 28) are barred by the failure

7  to exhaust administrative remedies; Plaintiff's allegations as to Cpl. Lara (paragraph 30,

8  paragraph 35, lines 20-24, and paragraphs 44-47) are barred by the failure to exhaust

9  administrative remedies; Plaintiff's allegations regarding certain events (paragraphs 39-43, 53-

10  54, 58-60) were found by the Court to not be adverse employment actions; Plaintiff's allegations

11  involving the extension of Sgt. Gray's probationary period (paragraph 64, lines 23-26) because

12  there is no allegation that Sokoloff was involved; and Plaintiff's allegations that she was

13  constructively discharged (included in paragraphs 8, 82, 83, 84, 89, 103, 104, 105, and 110).

14  (Doc. 47.)

15  **A. Legal Standard**

16  Rule 12(f) of the Federal Rules of Civil Procedure provides that a court may, by motion or

17  on its own initiative, "strike from a pleading an insufficient defense or any redundant, immaterial,

18  impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "The function of a 12(f) motion to

19  strike is to avoid the expenditure of time and money that must arise from litigating spurious issues

20  by dispensing with those issues prior to trial[.]" *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d

21  970, 973 (9th Cir. 2010) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993),

22  *rev'd on other grounds*, 510 U.S. 517 (1994)).

23  "Motions to strike are generally viewed with disfavor and will usually be denied unless

24  the allegations in the pleading have no possible relation to the controversy, and may cause

25  prejudice to one of the parties."  *King v. Gates*, No. 1:23-cv-01245-SAB (PC), 2024 WL

26  1118732, at *6 (E.D. Cal. Mar. 14, 2024) (citations omitted).  However, "the granting of a motion

27  to strike may be proper if it will make trial less complicated or eliminate serious risks of prejudice

28  to the moving party, delay, or confusion of the issues." *Winnemem Wintu Tribe v. U.S. Forest*

10

*Serv.*, No. 2:09-cv-1072 KJM KJN, 2013 WL 1325423 at *2 (E.D. Cal. Mar. 29, 2013) (quotation

marks and citation omitted).  "Ultimately, whether to grant a motion to strike lies within the

sound discretion of the district court." *Cruz v. Bank of N.Y. Mellon*, No. 12-cv-00846, 2012 WL

2838957, at *2 (N.D. Cal. July 10, 2012) (citing *Whittlestone*, 618 F.3d at 973)).

### B. Discussion

As more fully detailed below, Defendant's motion to strike is GRANTED as to (1)

Plaintiff's disparate treatment allegations in paragraph 38, line 11 (only) because the Court

dismissed Plaintiff's sex discrimination claims based on a disparate treatment theory without

leave to amend; and (2) Plaintiff's allegations as to Sgt E. Martinez (paragraph 8, line 18 and

paragraphs 23-26), as to Cpl. Lara (paragraph 30, paragraph 35, lines 20-24 [only to the extent

they are related to Cpl. Lara], and paragraphs 44-47), and Sokoloff's pre-December 2020 conduct

(paragraph 28) for the failure to exhaust administrative remedies.

The Court declines to exercise its discretion as to the request to strike additional material.

Accordingly, Defendant's motion to strike is DENIED as to (1) Plaintiff's allegations asserted to

be based on a disparate treatment theory (paragraphs 2-7), (2) Plaintiff's allegations regarding

certain events previously found by the Court to not be adverse employment actions (paragraphs

39-43, 53-54, 58-60), (3) Plaintiff's allegations involving the extension of Sgt. Gray's

probationary period (paragraph 64, lines 23-26); and (4) Plaintiff's allegations that she was

constructively discharged (included in paragraphs 8, 82, 83, 84, 89, 103, 104, 105, and 110).

### IV.    Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint

#### A. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim, and

dismissal is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts

alleged under a cognizable legal theory.  *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42

(9th Cir. 2011) (quotation marks and citations omitted).  A court may only consider the

complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal

Rule of Evidence 201. *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988);

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

1    To survive a motion to dismiss, a complaint must contain sufficient factual matter,

2    accepted as true, to state a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

3    (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (quotation marks

4    omitted); *Conservation Force*, 646 F.3d at 1242; *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969

5    (9th Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that

6    allows the court to draw the reasonable inference that the defendant is liable for the misconduct

7    alleged." *Iqbal*, 556 U.S. at 678. While the plausibility requirement is not akin to a probability

8    requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id.*

9    This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its

10   judicial experience and common sense." *Id.* at 679.

11   In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),

12   the court must accept as true the allegations of the complaint in question, *Erickson v. Pardus*, 551

13   U.S. 89, 94 (2007), and construe the pleading in the light most favorable to the plaintiff, *Jenkins*

14   *v. McKeithen*, 395 U.S. 411, 421 (1969); *Meek v. County of Riverside*, 183 F.3d 962, 965 (9th Cir.

15   1999).  However, the court need not credit "labels and conclusions" or "a formulaic recitation of

16   the elements of a cause of action."  *See Twombly*, 550 U.S. at 555.

17   If a complaint fails to state a plausible claim, "'[a] district court should grant leave to

18   amend even if no request to amend the pleading was made, unless it determines that the pleading

19   could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122,

20   1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

21   **B.  Discussion and Analysis**

22   **1.  First and Fourth Claims (Sex Discrimination)**

23   a.  <u>Disparate Treatment</u>

24   Defendant first argues that Plaintiff's disparate treatment allegations fail because this

25   Court dismissed Plaintiff's disparate treatment claims without leave to amend.  (Doc. 48 at 13.)

26   Plaintiff responds that her sex discrimination claims under Title VII and FEHA "are not, nor have

27   they ever been based on disparate treatment" and are instead "based on a sexually hostile work

28   environment."  (Doc. 59 at 9.)  Because Plaintiff admits she does not allege a cognizable sex

1    discrimination claim premised on a disparate treatment theory, Defendant's motion to dismiss

2    Plaintiff's sex discrimination claims based on disparate treatment is GRANTED with prejudice.

3                    b.    Hostile Work Environment

4         The Court now turns to Plaintiff's sex discrimination claims premised on a hostile work

5    environment.  "[B]ecause Title VII and FEHA operate under the same guiding principles," courts

6    often analyze Title VII and FEHA hostile work environment claims under federal law. *Brooks v.*

7    *City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) ("While Brooks argues that she was

8    subjected to sexual discrimination under Title VII as well as FEHA, we need only assess her

9    claim under federal law because Title VII and FEHA operate under the same guiding

10   principles."); *see also McCullough v. City of Rialto*, No. 5:22-cv-00600-JWH-SP, 2023 WL

11   4157451, at *9 (C.D. Cal. Mar. 20, 2023) (applying Title VII framework to FEHA claims).  As it

12   did with the prior motion to dismiss, the Court will do so here.

13        Title VII makes it "an unlawful employment practice for an employer ... to discriminate

14   against any individual with respect to his compensation, terms, conditions, or privileges of

15   employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

16   § 2000e-2(a)(1); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). This "affords employees the

17   right to work in an environment free from discriminatory intimidation, ridicule, and insult."

18   *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).  "[A] plaintiff may establish a

19   violation of Title VII by proving that discrimination based on sex has created a hostile or abusive

20   work environment."  *Id.* at 66.

21        To state a hostile work environment claim under Title VII based upon sex, an employee

22   must allege that: "(1) she was subjected to verbal or physical conduct of a sexual nature; (2) the

23   conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the

24   conditions of her employment and create an abusive work environment."  *Porter v. California*

25   *Dep't of Corrections*, 419 F.3d 885, 892 (9th Cir. 2005)); *see also Vasquez v. County of Los*

26   *Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), as amended (Jan. 2, 2004); *Ortiz v. Fed. Bureau of*

27   *Prisons*, No. 1:22-cv-00122-JLT-SKO, 2023 WL 1447920, at *3 (E.D. Cal. Feb. 1, 2023); *Ortiz*

28   *v. Dameron Hosp. Assn.*, 37 Cal. App. 5th 568, 581 (2019) ("To establish a prima facie case of a

hostile work environment [under FEHA, the plaintiff] must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) defendants are liable for the harassment.").

"A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed." *Brooks*, 229 F.3d at 923. The working environment must be "subjectively and objectively" hostile. *Id.* at 923. To determine whether the conduct was sufficiently severe or pervasive, the court "must consider all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020) (internal quotations and citations omitted); *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005) (making the objective determination of whether the work environment is hostile requires courts to look at all of the circumstances, including the frequency, severity, and nature of the conduct); *Brooks*, 229 F.3d at 923 (explaining courts use a "totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment" and includes relevant factors of "frequency, severity and level of interference with work performance"); *Ortiz*, 2023 WL 1447920, at *4 (determining whether a work environment is hostile requires court to look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance").

A plaintiff must show a "concerted pattern of harassment of a repeated, routine or generalized nature." *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005). Title VII is not a "general civility

1  code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

2        <u>Administrative Exhaustion of New Allegations</u>[4]

3        Defendant suggests that Plaintiff has attempted to circumvent the Court's prior order of

4  dismissal by alleging new allegations that include alleged harassment by supervisors other than

5  Sokoloff.  (Doc. 48 at 15.)  Defendant argues the Court should not consider these new allegations

6  because Plaintiff failed to exhaust her administrative remedies.  In particular, Defendant contends

7  that Plaintiff's Equal Employment Opportunity Commission ("EEOC") complaint did not

8  describe any actions of any others aside from Sokoloff as the basis for her claim.  (*Id.*)

9        "Even though administrative exhaustion is no longer a jurisdictional requirement [under

10  Title VII], . . . a plaintiff must still allege compliance with the requirement in order to state a

11  claim on which relief can be granted." *Lawrence v. Driscoll*, No. 2:23-cv-01717-TLN-JDP, 2025

12  WL 894956, at *5 (E.D. Cal. Mar. 24, 2025) (citations omitted); *see also Hallmon v. Stanislaus*

13  *Cnty. Hum. Res. Dep't*, No. 1:19-cv-01623-DAD-EPG, 2022 WL 1204705, at *4 (E.D. Cal. Apr.

14  22, 2022) (explaining that even if administrative exhaustion is not a jurisdictional prerequisite to

15  bring a Title VII claim in court, a plaintiff must allege compliance with that requirement in order

16  to state a claim.  To establish "substantial compliance with administrative exhaustion, the

17  allegations of a plaintiff's judicial complaint must be 'like or reasonably related to the allegations'

18  in the administrative complaint submitted to the EEO, such that they would fall within 'the scope

19  of an EEOC investigation which [could] reasonably be expected to grow out of the

20  [administrative] charge of discrimination.'" *Williams v. Wolf*, No. 19-cv-00652-JCS, 2019 WL

21  6311381, at *6 (Nov. 25, 2019) (alterations in original) (citing *Sosa v. Hiraoka*, 920 F.2d 1451,

22  1456 (9th Cir. 1990); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 644 (9th Cir. 2003)).

23

24  [4] Defendant requests the Court take judicial notice of Plaintiff's EEOC complaint dated July 12, 2022. (Doc. 48-1, Request for Judicial Notice, Ex. A.)  Courts have found EEOC complaints

25  appropriate for judicial notice. *See Davis v. Wormuth*, No. 2:24-cv-00989-DJC-CSK, 2025 WL 958606, at *4 (E.D. Cal. Mar. 31, 2025) (taking judicial notice of EEOC complaint as a valid

26  matter of public record); *Lawrence v. Driscoll*, No. 2:23-CV-01717-TLN-JDP, 2025 WL 894956, at *4 (E.D. Cal. Mar. 24, 2025) (taking judicial notice of plaintiff's formal EEO complaint).

27  Further, Plaintiff has attached a copy of the EEOC complaint to her opposition to the motion to dismiss.  (*See* Doc. 59-1, Ex. E.)  Accordingly, Defendant's request for judicial notice (Ex. A) is

28  GRANTED.

1  "A new allegation can reasonably be expected to have grown out of another charge if the

2  new allegation is at least 'consistent with the plaintiff's original theory.'" *Randhawa v. Intel*

3  *Corp.*, No. 2:21-cv-00054-KJM-DB, 2022 WL 976957, at *3 (E.D. Cal. Mar. 31, 2022) (citing

4  *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2022).  The Ninth Circuit and

5  the Supreme Court have "directed district courts to construe administrative charges 'liberally,'—

6  even with the 'utmost liberality,'—so as to 'protect the employee's rights and statutory

7  remedies.'" *Id.* (internal citations omitted).

8  To make the determination, a court can consider the basis of the original charge to the

9  EEOC, the dates of the discrimination alleged in the charge, who allegedly perpetrated the

10  discrimination, and the locations where the discrimination allegedly occurred.  *Randhawa*, 2022

11  WL 976957 at *4 (citing *Freeman*, 291 F.3d at 636). "The focus is the factual statement in the

12  charge: who did what, when, where, and why?"  *Id.*

13  Defendant argues that Plaintiff did not even identify Sgt. Martinez or Cpl. Lara in her

14  EEOC complaint.  She therefore failed to exhaust her administrative remedies to bring claims

15  related to these employees or the particulars thereof.  (Doc. 48 at 15.)

16  Plaintiff counters that Defendant has not met its burden in establishing that the actions of

17  Sgt. Martinez and Cpl. Lara (or the pre-December 2020 conduct of Bruce Sokoloff) are barred

18  under Ninth Circuit law because they were not mentioned in her EEOC complaint.  Plaintiff

19  contends that the allegations concerning Martinez and Lara describe their alleged sexual

20  harassment, sex-based discrimination, retaliation, and contribution to Plaintiff's hostile work

21  environment.  She contends that because her EEOC complaint alleged sex discrimination,

22  retaliation, and a hostile work environment that eventually forced her to quit, the incidents

23  involving Martinez and Lara are like or reasonably related to, and are entirely consistent with, the

24  allegations in the EEOC complaint, as are Sokoloff's statements earlier in 2020.  (Doc. 59 at 10.)

25  Additionally, Plaintiff contends that in her third amended complaint, she "has simply added

26  further factual incidents of the sex-based harassment, discrimination, and retaliation explicitly

27  alleged in her EEOC charge."  (*Id.* at 11.)

28  The Court has reviewed the EEOC complaint dated July 12, 2022.  (Doc. 48-1, Ex. A.)

1    The EEOC complaint describes the alleged discrimination and retaliation as follows:

2         Bruce Sokoloff was originally a trusted mentor to me after I rejoined the
3         Porterville Police Department. However, beginning in December, 2020, things
         changed and he began asking me out for drinks, suggesting we go out of town
4         together, and apparently seeking an intimate relationship with me although he was
         married and I considered his wife a friend. I did my best to put him off, making
5         up excuses whenever he proposed us getting together alone or being sure there
6         were co-workers or other friends present whenever we were together outside of
         work.

7
         Eventually, I began dating Anthony Luckey, a fellow officer who joined the
8         Porterville Police Department in 2020. Once Lt. Sokoloff learned that Officer
         Luckey and I were romantically involved, he began retaliating against both of us,
9         got Anthony Luckey fired, and created a hostile work environment that eventually
         forced me to quit.
10

11    (Doc. 48-1, Ex. A.) The EEOC complaint identifies the "protected basis" of the alleged

12    discrimination and retaliation as follows: "I believe I was sexually harassed by Lt. Bruce Sokoloff

13    and retaliated against when I rebuffed Lt. Sokoloff's ongoing sexual harassment and began dating

14    a black co-worker, Anthony Luckey." (*Id.*) The EEOC complaint does not (1) name Martinez or

15    Lara; (2) discuss incidents prior to December 2020; or (3) involve alleged discriminatory,

16    harassing, or retaliatory acts by anyone other than Sokoloff. (*Id.*)

17         The allegations involving Martinez and Lara included in the TAC are not like or

18    reasonably related to the EEOC complaint. The new allegations involve other supervisory

19    personnel, incidents prior to December 2020, or incidents completely unrelated to the facts that

20    form the basis of the alleged sexual harassment and retaliation asserted in Plaintiff's EEOC

21    complaint. Further, the new factual allegations involving Martinez and Lara are inconsistent with

22    Plaintiff's original theory of the case, which was wholly limited to events beginning in December

23    2020 involving Sokoloff. Indeed, in the present litigation, Plaintiff did not raise these allegations

24    at any point prior to filing her third amended complaint. (*See, e.g.*, Docs. 1 [Complaint], 15 [First

25    Amended Complaint], 19 [Second Amended Complaint].) The Court therefore will not consider

26    new allegations involving Martinez and Lara that were not raised in the original EEOC

27

28
                                        17

1    complaint.[5] *See*, *e.g.*, *Green v. City & Cnty. of San Francisco*, No. 17-CV-00607-TSH, 2021 WL

2    3810243, at *21 (N.D. Cal. Aug. 26, 2021), aff'd, No. 21-16465, 2023 WL 7211421 (9th Cir.

3    Nov. 2, 2023) ("Federal courts cannot consider incidents of discrimination that are not included in

4    a plaintiff's EEOC charge unless those new allegations are 'like or reasonably related to' the

5    allegations made before the EEOC, as well as charges that are within the scope of an EEOC

6    investigation that reasonably could be expected to grow out of the allegations.").  This same

7    reasoning applies to the allegations in the TAC regarding the pre-December 2020 conduct of

8    Sokoloff.  As noted above, Plaintiff's EEOC complaint was limited to Sokoloff's conduct in

9    December 2020, and alleged retaliation after Plaintiff and Officer Luckey began to be

10   romantically involved.  (Doc. 48-1, Ex. A.)

11           Plaintiff's Remaining Allegations

12           With respect to the remaining allegations limited to Sokoloff beginning in December

13   2020, Defendant argues that Plaintiff fails to allege facts to plausibly demonstrate severe or

14   pervasive conduct constituting a hostile work environment.   (Doc. 48 at 16.)  In particular,

15   Defendant contends that Plaintiff continued working at least 15 months following Sokoloff's

16   alleged unwelcome December 2020 advances, and the TAC fails to allege a plausible claim of

17   hostile work environment because Plaintiff continued to perform her duties.  (*Id.*)  Defendant

18   additionally contends that Plaintiff does not sufficiently allege how Sokoloff's actions were based

19   on her sex, and that Plaintiff does not support her allegation that she was constructively

20   discharged based on severe and pervasive harassment that created a hostile work environment.

21

22   [5] Even if the Court were to set aside the issue of administrative exhaustion, Plaintiff's allegations
     involving other supervisory personnel in her third amended complaint exceed the permissible
23   scope of the Court's September 30, 2024 dismissal order granting Plaintiff leave to amend. (Doc.
     36.)  "[D]istrict courts often strike new claims, parties or factual allegations of an amended
24   complaint that are beyond the permissible scope of a court's prior order granting leave to amend."
     *Milkcrate Athletics Inc. v. Adidas Am., Inc.*, No. 2:21-cv-09328-FWS-JPR, 2022 WL 18284401,
25   at *4 (C.D. Cal. Nov. 9, 2022); *see also Gerritsen v. Warner Bros. Ent.*, 116 F. Supp. 3d 1104,
     1124–25 (C.D. Cal. 2015) (striking plaintiff's amendments that exceeded "the scope of leave to
26   amend granted by the court").  In its dismissal order, the Court identified pleading deficiencies in
     Plaintiff's second amended complaint concerning her allegations involving Sokoloff's conduct.
27   (*See* Doc. 36 at 9-10, 11-15).  The Court granted Plaintiff leave to amend her complaint solely "to
     cure the identified pleading deficiencies." (*Id.* at 20.)
28
                                                    18

1    (*Id.*)

2    In opposition, Plaintiff contends that the Ninth Circuit "has rejected the narrowly

3    proscribed showing of a sexually hostile work environment that Defendant recites." (Doc. 59 at

4    12.) Plaintiff argues recent case law has made clear that the overarching consideration in

5    determining whether a sexually hostile work environment exists is the totality of the

6    circumstances. (*Id.*) In so arguing, Plaintiff relies on *Okonowsky v. Garland*, 109 F.4th 1166,

7    1171 (9th Cir. 2024), for the proposition that the totality of the circumstances in a Title VII claim

8    includes evidence of sexually harassing conduct, even if it does not directly target the plaintiff, as

9    well as non-sexual conduct directed at the plaintiff that a jury could find retaliatory or

10   intimidating. (*Id.*)

11   The Ninth Circuit's decision in *Okonowsky* reiterated Ninth Circuit law regarding the

12   elements of claim based on a sexually hostile work environment. The *Okonowsky* court explained

13   that to determine whether a plaintiff was subjected to a sexually hostile work environment three

14   factors are examined: "1) whether [plaintiff] was subjected to verbal or physical conduct of a

15   sexual nature; 2) whether the conduct was unwelcome; and 3) whether the conduct was

16   'sufficiently severe or pervasive to alter the conditions of employment and create an abusive

17   working environment.'" 109 F.4th at 1178. The court further explained that the third factor

18   required the plaintiff to "show that her work environment was both subjectively and objectively

19   hostile." *Id.* at 1179 (citation omitted). Because the parties in the case did not dispute the first

20   two factors—that the plaintiff was subjected to unwanted verbal conduct based on her sex, or that

21   she subjectively perceived her work environment to be hostile—the court focused only on

22   whether the plaintiff "adduced evidence of sufficiently severe or pervasive sexually offensive

23   conduct from which a reasonable juror could conclude that [the plaintiff's] work environment was

24   objectively hostile from the perspective of a reasonable woman." *Id.* at 1179.

25   The Ninth Circuit instructed that in analyzing the objective hostility of a working

26   environment, a court must look "to the totality of the circumstances surrounding the plaintiff's

27   claim," including assessing the "frequency of the discriminatory conduct; its severity; whether it

28   [was] physically threatening or humiliating, or a mere offensive utterance; and whether it

1    unreasonably interfere[d] with an employee's work performance." *Okonowsky*, 109 F.4th at 1179

2    (citation omitted).  The Ninth Circuit further instructed that courts "also must consider that the

3    'required level of severity or seriousness varies inversely with the pervasiveness or frequency of

4    the conduct,' and the cumulative effect of conduct over time." *Id.* (internal citations omitted).

5    The Ninth Circuit emphasized that "[i]n all cases, 'simple teasing, offhand comments, and

6    isolated incidents (unless extremely serious)' will not trigger Title VII's protections." *Id.*

7    (citation omitted).

8         In *Okonowsky*, the plaintiff was a staff psychologist in a federal prison, who discovered

9    that a corrections Lieutenant with whom she worked, and who was responsible for overseeing the

10   safety of guards, prison staff, and inmates in the unit where she worked, operated an Instagram

11   account, which was followed by more than one hundred prison employees.  109 F.4th at 1171.

12   She learned that the Lieutenant had posted "sexually offensive content about work, and that she

13   was a personal target." *Id.*  When plaintiff complained about the page to prison leadership,

14   "management told her the page was 'funny'; the investigator whom the prison appointed to

15   investigate [plaintiff's] complaint told her the page's content was not 'a problem'; and the

16   Lieutenant began to increasingly target her with his posts." *Id.*

17        Viewing the evidence in the light most favorable to the plaintiff, the *Okonowsky* court

18   concluded that the plaintiff had raised triable issues of fact as to the existence of a hostile work

19   environment.  In so doing, the Ninth Circuit first considered the Lieutenant's conduct, identifying

20   that he "made hundreds of posts on his Instagram account over a five-month period, often posting

21   multiple times per day" and "[m]any of his posts about women in the workplace were

22   denigrating, suggestive of violence, and encouraged or at the very least made light of sexual

23   harassment in the workplace." 109 F.4th at 1183. He "posted about [plaintiff's] all-male co-

24   workers "gang banging" her; he described her in vulgar sexual terms; he humiliated and

25   intimidated her for reporting his conduct to management; and he called for his 'soldiers' to rally

26   in support of him after [plaintiff] complained to management." *Id.*  The Ninth Circuit determined

27   that a reasonable factfinder could conclude that numerous of the posts about plaintiff "were

28   intended to, and had the effect of, harassing [her] on the basis of her sex, humiliating and

1   degrading her, an intimidating her in an effort to shape her behavior in the workplace and

2   discourage future complaints about [the Lieutenant's] conduct." *Id.*  The Ninth Circuit further

3   determined that "a reasonable juror could credit [plaintiff's] testimony that, because [the

4   Lieutenant] supervised the corrections officers tasked with protecting [plaintiff] within the prison,

5   . . . , she found certain of his posts to be particularly 'threatening,' . . ., and menacing; she did not

6   feel safe at work; and she worried that she could not trust [the Lieutenant] and his direct reports to

7   protect her if an emergency arose." *Id.* (internal citation omitted).  The Ninth Circuit also

8   concluded that a juror could credit plaintiff's testimony that the actions of the Lieutenant "made it

9   more difficult to completed basic tasks and ultimately drove her to leave." *Id.*

10        Additionally, the Ninth Circuit considered the conduct of management and other co-

11  workers that contributed to the altered workplace.  This conduct included, among other things,

12  that many employees at the prison liked the Lieutenant's posts and commented favorably on them

13  and that managers and staff members in charge of enforcing workplace policy and investigating

14  plaintiff's complaint "acquiesced to and at times even endorsed [the] conduct." *Okonowsky*, 109

15  F.4th at 1184. The Ninth Circuit also considered the cumulative effect of the discriminatory

16  conduct, which included "three months of posts targeting [plaintiff], intimidating her, joking

17  about 'gang bang[ing]' her, possibly shooting her, as well as myriad posts endorsing sexual

18  harassment and/or violence toward women co-workers or women generally" and "the reactions of

19  management-level officials who endorsed [the] conduct even as [plaintiff] expressed her

20  concerns, and the refusal of prison officials to respond to or update [her] on the status of the

21  investigation even as [she] expressed that she no longer felt safe at work." *Id.* at 1185.

22        Relying on *Okonowsky,* Plaintiff contends that she has pleaded sufficient factual

23  allegations to show that her work environment was hostile from the perspective of a reasonable

24  woman.  (Doc. 59 at 14-15.)  Plaintiff states that she has pleaded:  Sokoloff was her supervisor

25  and a high-ranking officer, the sexual harassment she experienced from him deprived her of the

26  normal mentoring and support needed to advance and interfered with her job performance (TAC ¶

27  35), Sokoloff knowingly placed her in a situation that created a high risk of workplace injury and

28  she believe he was willing to jeopardize her safety just to harass and punished her (*id.* ¶ 42), facts

1   establishing that Sokoloff humiliated and intimidated her in an effort to shape her behavior in the

2   workplace (*id.* ¶¶ 43,59), she felt anxiety about going to work (*id.* ¶ 49), Sokoloff surveilled and

3   stalked her while at work (*id.* ¶ 66), Sokoloff's verbal intimidation made her feel alienated and

4   that higher-ups were watching her and assuming the worst about her (*id.* ¶ 60), Sokoloff told her

5   he wanted to "scare" her, and he had intentionally made her feel upset and scared at work (*id.* ¶

6   66), she worked in constant fear of unexpected discipline and threatened termination (*id.* ¶ 67),

7   just prior to her leaving the PPD Sokoloff directed that an Internal Affairs investigation be

8   conducted against her for an incident she had been told by her direct supervisor would only result

9   in an administrative review (*id.* ¶ 74), and during her exit interview, she told her interviewer that

10  she felt she had been on thin ice for some time and had been told she was close to getting fired

11  (*id.* ¶ 78).  (Doc. 59 at 15.)

12      Defendant replies that the allegations targeting Sokoloff are insufficiently severe or

13  pervasive to alter the conditions of employment and create an abusive working environment.

14  (Doc. 60 at 5.)  Defendant also contends that this case is distinguishable from *Okonowsky*, which

15  involved a high-ranking officer's systematic use of a public social media platform to post sexist,

16  racist, and harassing content, including materials specifically targeting the plaintiff.  Defendant

17  asserts that the harassment in *Okonowsky* was "persistent, overt, and publicly disseminated,

18  creating a workplace atmosphere of intimidation and hostility that directly interfered with the

19  plaintiff's ability to do her job and feel safe."  (*Id.*)  Defendant contends that here, by contrast,

20  Plaintiff's allegations against Sokoloff involve private interactions that were neither ongoing nor

21  public, and Plaintiff does not allege that Sokoloff's behavior caused an objectively hostile

22  workplace environment affecting her colleagues or the broader workplace culture.  Defendant

23  also contends that Plaintiff continued working for over a year without reporting Sokoloff's

24  alleged misconduct, further distinguishing this case from the systemic and pervasive harassment

25  present in *Okonowsky*.  (*Id.* at 5-6.)  Defendant additionally argues that even collectively, the

26  allegations here lack the frequency, severity, and workplace impact required to sustain a hostile

27  work environment claim.  Defendant points out that Plaintiff continued to work for PPD for more

28  than a year after Sokoloff's alleged advances, which undermines her claim that the workplace

1    became intolerable.  (*Id.* at 6.)

2            Although the conduct alleged in the TAC differs in severity and frequency from the

3    conduct at issue in *Okonowsky*, considering the totality of the circumstances surrounding

4    Plaintiff's claim of a hostile work environment, accepting as true the allegations of the TAC, and

5    construing the pleading in the light most favorable to the Plaintiff, the Court finds that her

6    allegations sufficiently demonstrate that Sokoloff's alleged conduct was ongoing or pervasive, or

7    objectively hostile.  As Plaintiff emphasizes in the TAC, Sokoloff's alleged conduct involved "an

8    unwelcome and persistent pursuit of Plaintiff throughout the month of December 2020, including

9    harassing her via text over the course of five days to have drinks alone with him, and then

10   harassing her repeatedly over the course of four days to go away with him alone while his wife

11   and children were out of town."  (TAC ¶ 8.)

12           Further, the Court finds that Plaintiff adequately alleges that Sokoloff's conduct changed

13   when she spurned his advances and became involved with another officer and that Sokoloff's

14   changed conduct resulted in an inability to perform her job, altered the conditions of employment,

15   or that it otherwise interfered with her work performance.  For an environment to be considered

16   hostile, the conduct must have unreasonably interfered with Plaintiff's work performance.  *Clark*

17   *County School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001); *Brooks*, 229 F.3d at 924

18   (identifying "level of interference with work performance" a factor particularly relevant to the

19   inquiry of whether a plaintiff's allegations make out a colorable claim of hostile work

20   environment).  Plaintiff alleges that, among other things, Sokoloff's conduct caused Plaintiff

21   "ongoing fear, anxiety, humiliation, and alienation at work," (TAC ¶ 8); as a result of Sokoloff's

22   "persistent advances," Plaintiff experienced fear and apprehension when going to work and

23   interacting with Sokoloff," (*id.* ¶ 35); because Sokoloff was her supervisor, she was "denied the

24   normal professional mentoring relationship that male PPD junior officers enjoyed with their

25   supervisors," which "necessarily interfered with her job performance," (*id.* ¶ 36); the sex-based

26   harassment "interfered with nearly every aspect of Plaintiff's work, because rather than simply

27   being able to perform and grow as an officer, she had to continually navigate the egos of her male

28   superior[ ] and endure the anger caused by her refusal to submit to [him]," (*id.* ¶¶ 82, 103).

1  Plaintiff also alleges she was denied "the ability to learn, grow, and advance in her career with

2  PPD because the same supervisor[] from whom Plaintiff should have been able to seek guidance

3  and support [was] also the perpetrator[s] who [was] discriminating and retaliating against her."

4  (TAC ¶¶ 83, 104.)

5        At the pleading stage, the Court finds that Plaintiff has sufficiently plead a cognizable sex

6  discrimination claims under Title VII and FEHA premised on a hostile work environment theory.

7        Additionally, Plaintiff alleges that "[c]continually harassed and threatened with

8  termination, [she] had no choice but to protect her reputation and livelihood by seeking a position

9  outside PPD and submitting her resignation. In effect, the retaliation and harassment to which she

10 was being subjected resulted in Plaintiff's constructive discharge."  (TAC ¶¶ 83, 104.)  "To show

11 constructive discharge, a plaintiff must show "working conditions so intolerable that a reasonable

12 person would have felt compelled to resign." *Penn. State Police v. Suders*, 542 U.S. 129, 147

13 (2004): *Doe v. County of Plumas*, No. 2:24-CV-02640-DJC-CSK, 2025 WL 2381815, at *11

14 (E.D. Cal. Aug. 15, 2025) ("Constructive discharge occurs when the employer's conduct

15 effectively forces an employee to resign.").  A "constructive discharge occurs when the working

16 conditions deteriorate, as a result of discrimination, to the point that they become 'sufficiently

17 extraordinary and egregious to overcome the normal motivation of a competent, diligent, and

18 reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'"

19 *Brooks*, 229 F.3d at 930.  There is a high bar for constructive discharge claims. *Wowo v. ITS*

20 *Logistics, LLC*, No. 3:24-CV-00061-ART-CSD, 2025 WL 275518, at *3 (D. Nev. Jan. 23, 2025)

21 (citing *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007)).  A hostile work environment can

22 support a constructive discharge theory. *Doe*, 2025 WL 2381815, at *11 (citing *Penn. State*

23 *Police*, 542 U.S. 40-41). As discussed above, Plaintiff sufficiently alleged she was subjected to a

24 hostile work environment due to Sokoloff's conduct, and she has plausibly alleged that she had

25 no choice but to resign because of the harassment.

26       For these reasons, Defendants' motion to dismiss Plaintiff's sex discrimination claims

27 premised on a hostile work environment theory is DENIED.

28 ///

1          **2.  Second and Fifth Claims (Retaliation)**

2          Plaintiff's second and fifth claims are for retaliation under Title VII and FEHA,

3   respectively, against the City of Porterville.  Defendant moves to dismiss these claims,

4   maintaining that the TAC does not allege sufficient facts showing a causal connection between

5   the alleged adverse employment actions and protected activity.  (Doc. 48 at 18.)

6          Title VII makes it unlawful "for an employer to discriminate against any of his employees

7   ... because he has opposed any practice made an unlawful employment practice by [Title VII] . . .

8   or because he has made a charge, testified, assisted, or participated in any manner in an

9   investigation, proceeding, or hearing under [Title VII] . . . ." 42 U.S.C. § 2000e-3(a). "An

10  employer can violate the anti-retaliation provisions of Title VII in either of two ways: (1) if the

11  adverse employment action occurs because of the employee's opposition to conduct made

12  unlawful [by Title VII]; or (2) if it is in retaliation for the employee's participation in the

13  machinery set up by Title VII to enforce its provisions." *Hashimoto v. Dalton*, 118 F.3d 671, 680

14  (9th Cir. 1997) (quotations and citations omitted).

15         To state a cognizable claim for retaliation in violation of Title VII, a plaintiff must

16  sufficiently plead that: (1) she engaged in a protected activity; (2) her employer subjected her to

17  an adverse employment action; and (3) there is a causal link between the protected activity and

18  the adverse action. *Bleeker v. Vilsack*, 468 F. App'x. 731, 732 (9th Cir. 2012); *Ray v. Henderson*,

19  217 F.3d 1234, 1240 (9th Cir. 2000).  Similarly, "to establish a prima facie case of retaliation

20  under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the

21  employer subjected the employee to an adverse employment action, and (3) a causal link existed

22  between the protected activity and the employer's action." *Rizvanovic v. Amazon.com Servs.*,

23  LLC, No. 1:21-cv-01804-JLT-CDB, 2024 WL 1886495, at *8 (E.D. Cal. Apr. 30, 2024) (quoting

24  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005)).  Because California courts look to

25  federal decisions under Title VII when analyzing retaliation claims under FEHA, the Court will

26  look to federal law when analyzing Plaintiff's retaliation claims.  *See Rivera v. E. Bay Mun.*

27  *Utilities Dist.*, No. 24-cv-02491-JD, 2025 WL 621992, at *3 (N.D. Cal. Feb. 25, 2025); *Klein v.*

28  *Walt Disney Co.*, No. CV13-01358 PSG (DTBx), 2014 WL 12587046, at *5 (C.D. Cal. June 6,

2014) ("Because of the similarity of Title VII's and FEHA's anti-retaliation provisions, California courts generally look to federal precedent when analyzing unlawful retaliation claims under FEHA.")

### a. Protected Activity

As to the first element, Plaintiff alleges that she "engaged in the protected activity of opposing the sexual harassment directed at her by Sokoloff, her supervisor throughout December 2020." (TAC ¶¶ 89, 110.) Caselaw suggests that resisting sexual advances is a protected activity, but the question is not settled. *See Yeaman v. City of Burley*, No. 4:21-CV-00345-BLW, 2023 WL 2868575, at *9 (D. Idaho Apr. 10, 2023) (noting several federal courts have split on whether an employee engages in protected activity when she rejects her supervisor's sexual advances, Ninth Circuit has not squarely addressed the question, and concluding that so long as employee "reasonably believes the advances constitute unlawful discrimination, her resistance is a protected activity"); *see also Iula v. Voos*, No. 23-CV-2277 JLS (AHG), 2024 WL 171395, at *4 (S.D. Cal. Jan. 16, 2024). The Court finds it unnecessary to decide the question for purposes of the instant motion as Defendant does not move to dismiss Plaintiff's retaliation claims for failure to adequately allege this element, (*see generally* Docs. 48, 60).

### b. Adverse Employment Action

The Court previously determined that Plaintiff sufficiently alleged the existence of adverse employment actions when (1) she received a formal write up in November 2021 [now alleged to have occurred in October 2021 (*see* TAC ¶¶ 61-62)]; (2) her vacation request was cancelled in February 2022; and (3) she was subjected to an internal affairs investigation in February 2022. (Doc. 36 at 13-14.)

Plaintiff has added new allegations in the TAC regarding events in February 2021 and March 2021. Plaintiff alleges that on February 11, 2021, Sokoloff belittled Plaintiff in front of her colleagues and falsely accused her of gross incompetence, telling her she 'can't do shit right.'" (TAC ¶ 37.) She also alleges that on March 10, 2021, she "completed and submitted a 5150 mental health hold report consistent with numerous other she had submitted previously without any issue. She later received a terse message from Sokoloff, stating her report was 'not

26

acceptable' and 'I hope you correct this deficiency quickly before u start as an FTO.'  Plaintiff's report was no different than any other she had written, but now she suddenly was being closely scrutinized, held to a different standard than her male co-workers, and criticized and threatened with consequences to her career."  (*Id.* ¶ 38.)

"[A]n adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation marks and citation omitted); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (specifying that the challenged action must be "materially adverse," meaning that it would dissuade a reasonable worker from exercising protected rights); *Ray*, 217 F.3d at 1242–43 (adopting interpretation of "adverse employment action" to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter [employees] from engaging in protected activity").  The Ninth Circuit "define[s] adverse employment action broadly," and has "found that a wide array of disadvantageous changes in the workplace constitute adverse employment actions." *Ray*, 217 F.3d at 1240.  For example, adverse employment actions may include a transfer of job duties, undeserved performance ratings, and the dissemination of unfavorable job references. *Id.* at 1241 (internal citations and quotation marks omitted).

In her opposition, Plaintiff attempts to clarify the basis of her retaliation claim, indicating that Defendant "continues to misconstrue and mischaracterize Plaintiff's claims for retaliation under Title VII and FEHA, and to confuse the months-long retaliatory harassment to which Sokoloff subjected Plaintiff that created an intolerable work environment and led to Plaintiff's constructive discharge with individual 'adverse employment actions.'"  (Doc. 59 at 16.)  Plaintiff cites *Bailey v. San Francisco Dist. Attorney's Office*, 16 Cal.5th 611, 638 (2024), to explain "how hostile work environment retaliation claims are reviewed," asserting that the alleged retaliatory acts are to be considered collectively rather than individually.  *Id.* Plaintiff contends that the TAC includes ten pages of factual allegations describing Sokoloff's retaliatory actions and she has "pleaded that the hostile, demeaning, threatening and humiliating actions taken against her began in mid to late January 2021, shortly after she rejected Sokoloff's advances."  (*Id.* at 17.)  Plaintiff

1    also contends that none of these actions individually are required to be adverse employment

2    actions.  (*Id.* at 18.)

3          In *Bailey*, the court explained that adverse treatment that is reasonably likely to impair an

4    employee's job performance or prospects for advancement in their career falls within the reach of

5    FEHA's antiretaliation provision."  *Bailey*, 16 Cal.5th 611, 637-38.  As Plaintiff notes, *Bailey*

6    indicated that the alleged retaliatory acts are to be considered collectively, rather than

7    individually, and that retaliatory acts "may take the form of a 'series of subtle, yet damaging,

8    injuries.'"  (*Id.* at 638.)  However, *Bailey* also acknowledged that a mere offensive utterance,

9    pattern of social slights, or "minor or relatively trivial adverse actions or conduct by employers or

10   fellow employees that, from an objective perspective, are reasonably likely to do no more than

11   anger or upset an employee cannot properly be viewed as materially affecting the terms,

12   conditions, or privileges of employment and are not actionable."  (*Id.* at 637.)

13         When a hostile work environment is alleged as part of a retaliation claim, a plaintiff must

14   show the harassment is 'sufficiently severe or pervasive to alter the conditions of the victim's

15   employment and create an abusive working environment.'"  *Ray*, 217 F.3d at 1245; *Hardage v.*

16   *CBS Broad., Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005), amended on denial of reh'g, 433 F.3d 672

17   (9th Cir. 2006), amended on denial of reh'g, 436 F.3d 1050 (9th Cir. 2006).  Taking all of

18   Plaintiff's allegations together, including events in February and March 2021, and viewing the

19   TAC in the light most favorable to Plaintiff, she has alleged a pattern of harassment sufficiently

20   severe or pervasive to support claims for hostile work environment.

21         Additionally, the Court notes that the crux of Plaintiff's current retaliation claims under

22   Title VII and FEHA appears to center on her allegations in the TAC that "Sokoloff's retaliation

23   consisted of a continuous pattern of intentional harassment such that Plaintiff's working condition

24   became so intolerable that she accepted a lower-paid position with her former employer as soon

25   as it became available.  In effect, the retaliation and harassment to which she was being subjected

26   resulted in Plaintiff's constructive discharge."  (TAC ¶¶ 89, 110.)  Plaintiff notes in her TAC that

27   constructive discharge is recognized to be an adverse employment action under both federal and

28   state law.  (TAC ¶ 83 n.2.)  Plaintiff is correct that constructive discharge can serve as an adverse

1    employment action for the purposes of a retaliation claim under both Title VII and FEHA.  *See*

2    *Jordan v. Clark*, 847 F.2d 1368, 1377 n.10 (9th Cir. 1988) (Title VII); *Steele v. Youthful Offender*

3    *Parole Bd.*, 162 Cal App. 4th 1241, 1253 (2008) (FEHA).  As indicated, Plaintiff has adequately

4    alleged constructive discharge.

c.    <u>Causal Connection</u>

6           Defendant argues that the TAC does not allege sufficient facts showing a causal

7    connection between the alleged adverse employment action and any protected activity.  (Doc. 48

8    at 18.)  The Court disagrees.

9           Causation may be "inferred from circumstantial evidence, such as the employer's

10   knowledge that the plaintiff engaged in protected activities and the proximity in time between the

11   protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d

12   1371, 1375 (9th Cir. 1987).  Indeed, "causation can be inferred from timing alone where an

13   adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island*

14   *Air*, 281 F.3d 1054, 1065 (9th Cir. 2002).

15          The Court finds that the temporal proximity between Plaintiff's rejection of Sokoloff's

16   advances in December 2020 and the alleged adverse employment actions beginning in February

17   2011—less than a couple of months later—is sufficient to infer causation.  "When adverse

18   employment decisions closely follow complaints of discrimination, retaliatory intent may be

19   inferred." *See Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 850 (9th Cir. 2004); *see*

20   *Yartzoff*, 809 F.2d at 1376 (finding sufficient evidence of causation where adverse employment

21   action occurred less than three months after protected activity).

22          Based on the foregoing, the Court finds that Plaintiff has stated cognizable retaliation

23   claims under Title VII and FEHA.  Accordingly, Defendant's motion to dismiss Plaintiff's second

24   and fifth claims for retaliation is DENIED.

**3.   Third Claim (*Monell*)**

26          Defendant moves to dismiss Plaintiff's third clam for relief under 42 U.S.C. § 1983

27   against the City of Porterville.  (Doc. 48 at 18.)

28          Municipalities "cannot be held liable [for the actions of their employees] under § 1983 on

1    a respondeat superior theory." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 591

2    (1978).  Instead, the constitutional injury must occur during the execution of an official "policy or

3    custom." *Id.* at 694.  "A plaintiff may assert *Monell* liability based on: (1) an official policy; (2) a

4    'longstanding practice or custom which constitutes the standard operating procedure of the local

5    government entity'; (3) the act of an 'official whose acts fairly represent official policy such that

6    the challenged action constituted official policy'; or (4) where "an official with final policy-

7    making authority 'delegated that authority to, or ratified the decision of, a subordinate.'"

8    *Bustamante v. County of Shasta*, No. 2:23-cv-01552-TLN-DMC, 2024 WL 3673529, at *2 (E.D.

9    Cal. Aug. 6, 2024) (quoting *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008)).

10           Defendant argues Plaintiff's *Monell* claim should be dismissed because she has not

11   sufficiently pled *Monell* liability based on ratification.  (Doc. 48 at 18-19.)  Under a theory of

12   ratification, a municipality may be liable if "an official with final policy-making authority ratified

13   a subordinate's unconstitutional decision or action and the basis for it."  *Gillette v. Delmore*, 979

14   F.2d 1342, 1346–1347 (9th Cir. 1992). "Ratification requires that the policymaker engage in a

15   'conscious, affirmative choice' to endorse a subordinate's conduct."  *Bustamante*, 2024 WL

16   3673529 at *3, quoting *Gillette*, 979 F.2d at 1347.  Plaintiff responds that "[n]owhere in the TAC

17   does Plaintiff assert liability based on a theory of ratification."  (Doc. 59 at 19.)  Thus, Plaintiff

18   concedes that the TAC fails to state a cognizable *Monell* claim based on a theory of ratification.

19   Plaintiff instead contends that her third claim for relief against Defendant "quite plainly assigns

20   *Monell* liability based on longstanding/widespread practice or custom."  (*Id.*, citing TAC ¶ 96.)

21           Plaintiff appears to have changed her theory of *Monell* liability. Throughout this litigation,

22   Plaintiff has pursued her claim for *Monell* liability based on a theory of ratification.  Indeed, in

23   opposing the motion to dismiss her second amended complaint, Plaintiff argued that she

24   sufficiently alleged a *Monell* claim based on the City of Porterville's ratification of Sokoloff's

25   conduct.  (*See* Doc. 30 at 7, citing authority for "ratification" in support of her argument).[6]

26   _____

27   [6] Plaintiff opposed the prior motion to dismiss on the ground of ratification arguing that: "[a]s
     Defendants acknowledge, Plaintiff's complaint specifically alleges that Defendant Sokoloff acted
     'with the full knowledge and support of the highest levels of the Porterville Police Department,

28   who as the authorized policymakers for the Porterville Police Department had knowledge of

1    Further, the Court affirmed in its September 30, 2024 order that "[o]nly ratification appeared to

2    be at issue in the case," (*see* Doc. 36 at 15), and found that Plaintiff's conclusory allegation was

3    insufficient to state a *Monell* claim against the City of Porterville based on ratification, (*id.* at 16).

4    The Court therefore dismissed the *Monell* claim with leave to amend.  (*Id.*)

5          In its dismissal order, the Court expressly stated that Plaintiff would be granted a final

6    opportunity "to amend to cure the identified pleading deficiencies."  (*Id.* at 20.)  Plaintiff's

7    amendments adding a new and different theory of *Monell* liability exceed the scope of the Court's

8    dismissal order regarding the deficiencies in her *Monell* claim, which was premised on a theory of

9    ratification.  This new theory of liability will be disregarded.  *See Davis v. Gen. Atomics*, No.

10   8:23-cv-00132-WLH-JDE, 2025 WL 1421906, at *6 (C.D. Cal. Apr. 18, 2025) (disregarding new

11   theories of liability under Title VII in amended complaint that exceeded scope of leave to amend);

12   *PB Farradyne, Inc. v. Peterson*, No. C 05-3447 SI, 2006 WL 2578273, at *3 (N.D. Cal. Sept. 6,

13   2006) (striking new theory of liability alleged in third amended complaint because new factual

14   allegations were "outside the scope of the leave to amend granted"); *see also Morris v. City of*

15   *Los Angeles*, No. 2:22-cv-09277-ODW (MRWx), 2024 WL 1256276, at *2 (C.D. Cal. Mar. 25,

16   2024) (striking any amendments that did not address the deficiencies identified in *Monell* claim

17   and went beyond the scope of the leave granted); *accord Sousa v. Walmart, Inc.*, No. 1:20-cv-

18   00500-EPG, 2023 WL 5278662, at *5 (E.D. Cal. Aug. 16, 2023) (noting "many district courts

19   treat newly pled theories of liability regarding already existing claims as procedurally improper

20   when the newly pled theories exceed the scope of leave to amend").  Accordingly, based on

21   Plaintiff's concession that she does not allege *Monell* liability based on a theory of ratification,

22   Defendant's motion to dismiss Plaintiff's third claim for *Monell* liability will be granted.  Further

23   leave to amend is not warranted because Plaintiff has been unable to cure the deficiencies in this

24   claim.

25   ///

26   ///

27

28   Defendant Sokoloff's unconstitutional conduct that led to Plaintiff's constructive termination and
     officially approved his conduct.'" (Doc. 30 at 7.)

**V.      Leave to Amend**

The Court's discretion to deny such leave is "particularly broad where the plaintiff has previously amended its complaint." *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir. 2013) (internal quotation marks and citation omitted).  Plaintiff has had four chances to assert her claims.  In its prior order, the Court indicated that this would be Plaintiff's final opportunity to amend to cure the identified pleading deficiencies.  (Doc. 36 at 20.) Accordingly, Plaintiff will not be granted an additional opportunity to amend her complaint with regard to any claims that have been dismissed herein.

**IV.      Conclusion and Order**

For the reasons stated, IT IS HEREBY ORDERED as follows:

1. Defendant's request for judicial notice, (Doc. 48-1), is GRANTED.

2. Defendant's motion to strike, (Doc. 47), is GRANTED IN PART and DENIED IN PART.

3. Defendant's motion to dismiss, (Doc. 48), is GRANTED IN PART and DENIED IN PART as follows:

   a. Defendant's motion to dismiss Plaintiff's first and fourth claims for relief alleging sex discrimination premised on a disparate treatment theory under Title VII and FEHA, respectively, is GRANTED.  Plaintiff's sex discrimination claims premised on a disparate treatment theory are dismissed with prejudice and without leave to amend.

   b. Defendant's motion to dismiss Plaintiff's first and fourth claims for relief alleging sex discrimination premised on a hostile work environment under Title VII and FEHA, respectively, is DENIED.

   c. Defendant's motion to dismiss Plaintiff's second and fifth claims for relief alleging retaliation under Title VII and FEHA, respectively, is DENIED.

   d. Defendant's motion to dismiss Plaintiff's third claim for relief alleging violations of 42 U.S.C. § 1983 (*Monell* liability) is GRANTED.  Plaintiff's third cause of action under § 1983 is dismissed with prejudice.

32

4.  Defendant shall file an answer to the TAC within twenty-one (21) days of the date of this Order.

IT IS SO ORDERED.

Dated:  __**September 30, 2025**__          ___/s/ *Barbara A. McAuliffe*___

UNITED STATES MAGISTRATE JUDGE